UNITED STATES of America,
Appellee,

v.

Yinka Olanrewaju BADMUS,
Defendant–Appellant.

Docket No. 02–1225.

United States Court of Appeals,
Second Circuit.

Argued: March 3, 2003.

Decided: March 27, 2003.

Susan Corkery, Assistant United States Attorney, for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York (Katya Jestin, Assistant United States Attorney, on the brief), New York, NY, for appellee.

David A. Lewis, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for defendant-appellant.

Before: CALABRESI, SACK, and CUDAHY, Circuit Judges.*

PER CURIAM.

Defendant–Appellant Yinka Olanrewaju Badmus was convicted, following a jury

* The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

trial, of one count of attempted possession of five or more false identification documents with the intent to use them and to transfer them unlawfully, in violation of 18 U.S.C. § 1028(a)(3) and (f). The district court (Gleeson, *J.*) sentenced Defendant principally to 30 months' imprisonment, which he is currently serving. Defendant appeals his conviction on the ground that the district court should have excluded statements that, prior to receiving *Miranda* warnings, Defendant made to agents during what, he asserts, amounted to a custodial interrogation. Defendant also appeals his sentence on the ground that the district court erred in calculating the number of documents involved in the offense and, as a result, erroneously added a six-level enhancement rather than a three-level enhancement to his guideline base offense level. We affirm.

## I. BACKGROUND

In September 2000, the U.S. State Department was notified by Belgian officials that they had intercepted a suspicious DHL express mail package. The package was forwarded to Agent Brian Falzetta in October, and he discovered that it contained 14 fraudulent passports from various African countries. The package was addressed to Yinka Badmus at an address on Lincoln Road in Brooklyn, New York. Agent Falzetta investigated and learned that the Badmuses had moved out of the Lincoln Road apartment and into an apartment on Nostrand Avenue, also in Brooklyn.

In late December 2000, agents arranged delivery of the package to Defendant at the Nostrand Avenue apartment. One agent, posing as a DHL employee, delivered the package, which Defendant's wife signed for. Three other agents then approached the apartment, identified themselves, told Mrs. Badmus that the package contained fraudulent passports, and asked if they could come in. According to the agents' testimony at the suppression hearing, which the district court credited "in its entirety," Mrs. Badmus admitted the agents into the apartment, consented to a security sweep (which lasted about two minutes), and further consented to a search of the apartment, which lasted between two and three hours. The agent told Mrs. Badmus that they were "guests in her house," and would leave if she asked them to go.

During the search, the agents discovered (1) about 150 passport photos, some of which were identical photographs with different names and biographical data written on the back; (2) applications and other paperwork relating to the Diversity Visa Lottery Program;[1] (3) a composition book listing names, numbers, amounts of money and occupations, as well as references to the "DV 2000 visa lottery"; and (4) a luggage tag and phone bill, both bearing the Lincoln Road address.

At one point during the search, Agent Christine Trulli stepped out into the hallway and observed Defendant leaving the elevator. She testified that he said something about having gotten off on the wrong floor, and that he then entered the stairwell. Agent Trulli said she subsequently pressed the elevator button and, when it returned to the Sixth Floor, Defendant was inside. She asked him to step out of the elevator and requested identification. After confirming that he was Mr. Badmus, she asked him to come into his apartment.

---

**1.** The Diversity Visa Lottery Program is an immigration lottery administered by the State Department, under which individuals from "low-admission" countries are given a ran- dom chance for the opportunity to apply for an expedited permanent immigration visa to the United States.

According to the agents' testimony, when Defendant entered the apartment, they stopped their search, informed Defendant about the DHL package, and sought permission from him to continue searching the apartment. One agent explained to Defendant that they were "guests in his house," that Defendant could ask them to leave at any time, and that neither he nor his wife was under arrest. The agent testified that Defendant responded that he had nothing to hide, and consented to the continued search.

The agents showed Defendant the pictures and documents that they found, and Defendant acknowledged that he helped family members and friends apply to the Lottery Program. When shown identical photos with different names written on the back, Defendant said that the individuals "must be triplets." Agents then discovered that some of the photographs and documents in the apartment featured a person who was depicted in two of the fraudulent passports. Defendant was placed under arrest.

During the search, prior to Defendant's arrest, Defendant and his wife remained seated in the living room, with one exception: at one point, Defendant said he was hungry and Agent Falzetta "agreed to let ... Mrs. Badmus go to the kitchen to fix Mr. Badmus something to eat." Agent Falzetta explained this by saying that "for officer safety purposes, as a general rule we try to limit people's movement in the apartment while we're in there." He also testified that, for security reasons, he would not have allowed Mrs. Badmus into the bedroom where the agents were searching. There were at least five agents in the small apartment, and each had a holstered firearm. One agent testified that it was warm in the apartment, and that when the agents removed their wind breakers, their weapons would have been visible. He further testified that his weapon was briefly unholstered during the security sweep while he searched a bedroom closet, but that Mrs. Badmus was in the living room at the time and would not have seen the unholstered gun.

After placing Defendant under arrest, the agents took him to their office in Manhattan and read him his *Miranda* rights. Defendant refused to waive his rights and did not agree to answer any questions.

Following Defendant's arrest, some of the agents went to the Lincoln Road apartment. Mrs. Badmus was there (apparently having gone there soon after her husband was arrested), as was a Mr. Sanya, who lived there. With Mr. Sanya's consent, the agents searched that apartment as well, and found several more photographs, and 20 completed applications for the visa lottery. Each application consisted of a passport-sized photograph clipped to a printed form with biographical information about the applicant. Although there were 20 applications, each with different names and biographical information, the corresponding photographs were of only four different individuals. Seven of the applications, which the government entered at trial as exhibits 8a–8g, showed one woman; five applications, exhibits 8h–8l, showed another woman;[2] six applications, 8m–8r, showed one man; and two applications, 8s–8t, showed another man.

Evidence at trial established that all 14 of the passports in the DHL package were fraudulent, and that the six countries from which they appeared to have been issued were among the countries qualified for the

---

**2.** Defendant asserts that the woman whose photo is attached to exhibits 8h–8l is the same woman as the one in exhibits 8a–8g. Given our interpretation of the "set of documents" language in the sentencing guideline, we need not resolve this dispute.

Lottery Program. Applicants to the Lottery Program are permitted one, and only one, entry, and the submission of multiple entries is against the law. The State Department's expert testified that the 20 applications found in the Lincoln Road apartment were part of an effort to submit multiple entries to the visa lottery on behalf of one person. He further testified that the submission of multiple entries under multiple identities was the most common fraud committed with respect to the lottery program. The government's handwriting analyst testified that the documents all had Mr. Badmus's handwriting on them. The jury returned a verdict of guilty.

The Presentence Report ("PSR") applied U.S.S.G. § 2L2.1, which governs, inter alia, "Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status . . .; False Statement in Respect to the Citizenship or Immigration Status of Another," and therefore started with a base offense level of 11. The PSR next considered the Specific Offense Characteristic provision which states, in relevant part:

> (2) If the offense involved six or more documents or passports, increase as follows:

| Number of Documents/Passports | Increase in Level |
| --- | --- |
| (A) 6–24 | add 3 |
| (B) 25–99 | add 6 |
| (C) 100 or more | add 9. |

U.S.S.G. § 2L2.1(b)(2).

The PSR found that the offense involved more than 100 documents: it counted 14 passports, 63 visa applications,[3] and more than 300 photographs. The PSR consequently increased the offense level by 9, to 20, which, given Defendant's Criminal History Category of I, resulted in a sentencing range of 33 to 41 months.

Defendant raised several objections to the PSR, some of which were accepted by the district court. The court agreed that the loose photographs were not "involved in the offense" under the guidelines definition, and apparently agreed that the non-duplicative visa applications and other documents had not been shown to be part of the fraudulent scheme. The court therefore based its calculation of the number of documents "involved" in the "offense" solely on the 14 fraudulent passports and the 20 completed lottery applications that were multiple entries for the four (or possibly three) individuals whose photos were attached to them.

As to the 20 duplicative lottery applications, Defendant raised two objections. First, Defendant argued that the documents, which were found in the Lincoln Avenue apartment, had not been sufficiently linked to Mr. Badmus. As to this, the government replied that the documents were connected to Defendant in several ways, including (1) that he used to live at the Lincoln Road apartment; (2) that the current residents of the apartment identified the documents as belonging to Defendant; (3) that a handwriting expert concluded that Defendant's handwriting was on all of the documents. The district court agreed with the government, making the factual finding that the documents "are plainly" Defendant's.

Second, Defendant argued that the district court erred in calculating the number of "documents" for the purposes of the specific offense characteristic guideline. He pointed to application note 2 of the relevant guideline, which states: "Where it is established that multiple documents are part of a set of documents intended for use

---

**3.** These included the 20 multiple lottery applications, exhibits 8a–8t, as well as other, non- duplicative applications and other documents found at both apartments.

by a single person, treat the set as one document." U.S.S.G. § 2L2.1, app. n. 2. Defendant contended that, since the 20 duplicative lottery applications were intended for use by only three (or possibly four) people, the 20 applications were really three (or four) "sets of multiple applications" and should be counted as three (or four) "documents." Defendant, therefore, counted a total of 17 documents (14 passports and 3 "sets" of multiple applications), which warranted an upward adjustment of 3, for a total offense level of 14, and a corresponding sentencing range of 15 to 21 months.

The district court disagreed:

I reject that argument.... [The application note] seems to me plainly intended to deal with a set of documents intended for a single use by a single person. Here this is a diversity visa program. The more entries you have in that lottery the more likely you are to win.

This is not a situation where there's an application plus a photograph, plus other paperwork associated with the application that is going to be all together a single use by one individual.

That, in my mind, is what this application note has in mind, and the unfairness—it has in mind eliminating the unfairness as to a single application. Here that's not what happened, that's not what the evidence shows. The evidence shows that these were perhaps single individuals, but they were going to make, I find, multiple applications to this diversity visa program.

Because the court concluded that there were more than 25, but fewer than 100, documents involved, it found an offense level of 19 (base offense level of 11, plus upward adjustment of 6 based on the number of documents, plus a two-level enhancement for obstruction of justice).

This produced a range of 30 to 37 months. And the court sentenced Defendant to 30 months. This appeal followed.

## II. DISCUSSION

### A.

■ *Miranda* warnings must be given when a person is interrogated while "in custody." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Tankleff v. Senkowski,* 135 F.3d 235, 242 (2d Cir.1998). "A person is in custody for purposes of *Miranda* if a reasonable person in the suspect's shoes would not have felt free to leave under the circumstances." *United States v. Ali,* 86 F.3d 275, 276 (2d Cir.1996) (internal punctuation and citation omitted). Even without an actual arrest, an accused is "in custody" when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Id.* Determining whether a defendant was "in custody" involves "[t]wo discrete inquiries ... first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (footnote omitted). The first inquiry is distinctly factual, while the second is a mixed question of law and fact which the appellate court reviews de novo. *Id.* at 112–13, 116 S.Ct. 457; *see also United States v. Romaszko,* 253 F.3d 757, 760 (2d Cir.2001) (per curiam) ("The district court's factual findings on a custody issue are reviewed for clear error, and its legal conclusions are reviewed *de novo*" (citations omitted)).

■ The district court made factual findings that the agents told Defendant and his wife, several times, that they were

not under arrest, that the agents were "guests in [their] house," and that the agents would leave if the Badmuses asked them to go. It found that "guns were not drawn at any time in the presence of either the defendant or his wife," and that "Mrs. Badmus was poised, not apparently intimidated." The court found that "these circumstances ... involve the defendant in familiar comfortable surroundings, that is his home ... [and] in an environment where he was apprised of this rights."

On the other hand, the court found that, after they gave consent to the search, Defendant and his wife were asked to stay seated in the living room and not allowed to move freely about the apartment. Also, it found that "[t]here were half a dozen officers in the apartment, and it's not a big apartment." Furthermore, undisputed testimony showed that the agents did have (holstered) guns, which may have been visible to the defendant and his wife, and that they were in the apartment for nearly three hours.

"In determining whether a suspect was in custody, we look at all the circumstances surrounding the interrogation." *Tankleff*, 135 F.3d at 243. Based on the totality of the circumstances, given the district court's factual findings—and in particular its finding that the agents informed the defendant and his wife that they were not under arrest and could ask the agents to leave at any time, *see Campaneria v. Reid*, 891 F.2d 1014, 1020 n. 1 (2d Cir.1989) (concluding that defendant was not in custody, in part, because "the officers had not physically or verbally indicated to [the defendant] that he was not free to leave")— we find that a reasonable person would have understood that he or she was not in custody. The district court's factual findings are not clearly erroneous, and therefore the district court did not err in deny-

ing Defendant's motion to suppress the statements he made in the apartment.

*B.*

■ The Sentencing Guidelines, "having the force and effect of law, are to be construed as if they were a statute, giving the words used their common meaning, absent a clearly expressed manifestation of contrary intent." *United States v. Kirvan*, 86 F.3d 309, 311 (2d Cir.1996) (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)); *see also United States v. Maria*, 186 F.3d 65, 70 (2d Cir.1999) (applying these principles to application notes and commentary).

Application note 2 states that "[w]here it is established that multiple documents are part of a set of documents intended for use by a single person, treat the set as one document." U.S.S.G. § 2L2.1, app. n. 2. Defendant argues that because, for example, exhibits 8a–8g are intended for use by a single person, they constitute a "set" that is to be treated as one document, and that the district court ignored the "plain meaning" of the guideline commentary by interpreting it to mean "intended for a *single use* by a single person." Defendant contends that the district court's interpretation "hardly makes sense," because many fraudulent documents, such as passports, are often used more than once, and the guideline clearly did not base the enhancement on this factor. Defendant misunderstands both the commentary and the district court's interpretation of it.

■ When the district court interpreted the application note as applying to a set of documents "intended for a *single* use by a single person," the court did not mean "a *one-time* use." Rather, it interpreted the application note as applying to a set of documents that would be used, together,

by one person, for a single purpose.[4] Thus, an individual might have a "set" of fraudulent immigration papers—including a counterfeit passport, phony green card, and forged work papers—for use in establishing a particular false identity in the United States. Under application note 2, these "multiple documents [which] are part of a set of documents intended for use by a single person" would count as only one document. They would continue to constitute only one document even if used many times, by one individual, to perpetuate the same false identity fraud. This is so because the *number of documents* in each set is unrelated to the number of false identity scams; and all of the documents can be used together "as a set" to bring about the scam or scams. This was the district court's understanding, and it is the most straightforward interpretation of the application note's text.

Conversely, Defendant's interpretation would have us read the words "part of a set of documents" out of the text, and interpret the note as if it said that "[w]here it is established that multiple documents are . . . intended for use by a single person, treat . . . [them] as one document." Under this reading, an individual who forges one phony passport to create a false identity for himself is subject to the same sentence as an individual who forges 100 phony passports—each bearing his own likeness, but with different names and nationalities—to perpetuate 100 separate scams, each requiring a different passport. Similarly, Defendant's reasoning would mean that an individual who illegally submits two entries to the visa lottery is as culpable as an individual who illegally submits a thousand entries. In both of the above examples, the very fact of having *more* false documents enables a perpetra-

tor to commit additional crimes, in which, moreover, the fake documents are not, and indeed cannot be, used together "as a set."

Few courts have considered this application note, but those that have support the district court's reading. In *United States v. Castellanos*, 165 F.3d 1129 (7th Cir. 1999), for example, the defendant was found with 24 sheets of blank counterfeit resident alien cards (each sheet containing eight impressions), and 2 sheets of blank counterfeit social security cards (each sheet containing 12 impressions). *Id.* at 1132. The court rejected the defendant's assertion that each sheet should be deemed a "set" so that he would be charged with 26 documents. The court observed that "[o]ne person could not use, for identification purposes, 12 Social Security cards or 8 resident alien cards found on one sheet," but that "a single individual might buy and use, for identification purposes, both a Social Security card and an alien registration card. Thus, conceivably, the district court might have counted 24 sets of Social Security and resident alien cards, and an additional, separate 172 resident alien cards." *Id.* at 1133.

We have considered the defendant's other arguments and find that they lack merit.

### III. CONCLUSION

The district court did not err in denying Defendant's motion to suppress the statements he made to the agents in his apartment, nor did it err in finding that Defendant's offense involved more than 25 documents. The conviction and sentence are therefore AFFIRMED.

---

4. A "set" is commonly defined as "a number of things of the same kind that belong or are used together." Merriam–Webster's Collegiate Dictionary 1071 (10th ed.1997).