# United States Court of Appeals
## For the First Circuit

No.  07-2510

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID JACKSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Boudin, and Dyk,* Circuit Judges.

Eric A. Vos, Assistant Federal Public Defender, for appellant.
Margaret D. McGaughney, Appellate Chief, with whom Paul D.
Silsby, United States Attorney, was on brief for appellee.

October 8, 2008

---

* Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**.  David Jackson ("Jackson") appeals from his conviction, under 18 U.S.C. §§ 922(g)(1) and 924(e), as a felon in possession of a firearm.  Pursuant to Federal Rule of Criminal Procedure 11(a)(2), Jackson entered a conditional guilty plea, reserving the right to appeal the district court's underlying decision on Jackson's motion to suppress.  Jackson sought to suppress several incriminating statements that he made to the police and guns discovered as a result of those statements, alleging that the statements were taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  The focus was on statements given before Jackson received Miranda warnings.  The district court found that, although Jackson was in custody, he was not subjected to "interrogation" for purposes of Miranda with respect to statements at issue on this appeal, and rejected Jackson's motion to suppress.  Because we conclude that Jackson was subjected to custodial interrogation before being given his Miranda warnings, we vacate the judgment of conviction and remand to the district court for further proceedings.

## I.

The following description of events is based on the testimony of the police officers, which the district court found to be credible, and does not rely on the testimony of Jackson, which the district court found not to be credible to the extent that it conflicted with the officers' testimony.

- 2 -

On the morning of July 13, 2004, Lewiston, Maine, police officer Michael Lacombe ("Lacombe") responded to a call from Mark Hoener, who had reported the theft of a RG twenty-two caliber pistol from his residence. Hoener suspected his stepson, Tyler Mancuso ("Mancuso"). Lacombe and Trevor Campbell ("Campbell"), another Lewiston police officer who had arrived in response to Lacombe's request for assistance, confronted and arrested Mancuso, who admitted to stealing the pistol from his stepfather and reported that he traded the stolen gun for $100 worth of crack cocaine to an individual known as "Scooby." Mancuso gave Campbell a physical description of the individual.

Campbell recognized Mancuso's physical description and the nickname Scooby as that of David Jackson, whom Campbell had previously encountered. Campbell telephoned the police station and learned that Jackson was on state probation from an earlier conviction. Campbell contacted Pauline Gudas, Jackson's parole officer, who informed him that, as a condition of Jackson's parole, his residence could be subjected to random searches for weapons or alcohol. Gudas also told Campbell that Jackson had a number of previous convictions, and that Jackson was currently staying at the apartment residence of Pamela Belanger ("Belanger").

Later that morning, Campbell and his partner, Chris Clifford ("Clifford"), led a group of officers, including Lacombe and Gudas, to Belanger's apartment. In all, at least eight

officers went to the apartment. Once the officers arrived on the scene, Campbell knocked on the door, which Belanger answered. Campbell saw Jackson standing several feet behind Belanger. He noticed that Jackson's attire and appearance fit Mancuso's description of the individual who bought the gun. Campbell asked Jackson to step out of the apartment so that he could pat him down for weapons. He then described to Jackson the circumstances concerning the stolen gun and the earlier encounter with Mancuso. He explained to Jackson that he (Jackson) fit Mancuso's description of the buyer, and that he and the other officers were there to locate the stolen firearm. He questioned Jackson as to his "involvement" with the stolen gun. Transcript of Suppression Hearing ("Suppression Hr'g Tr."), April 17, 2007 at 1:21-22 p.m., United States v. Jackson, No. 06-94-P-S (D. Me. 2007).

Attempting to elicit Jackson's cooperation, Campbell pressed Jackson on his involvement with the gun. He did not threaten Jackson, but he hinted that Jackson's cooperation might be met with leniency. Lacombe recalled that the "nature of the conversation" with Jackson was that "[w]e were there looking for a firearm so the conversation was to find this - - these firearms that we were looking for." Suppression Hr'g Tr., April 17, 2007 at 3:56 p.m. At this point, Jackson apparently stated that he might know where the gun was located, and that he could retrieve it if the officers would just give him a few hours. Campbell, not

- 4 -

willing to allow Jackson an opportunity to escape or to retrieve a deadly weapon, replied that Jackson was not permitted to leave.

Frustrated with Jackson's refusal to cooperate, Campbell decided to give Jackson time to think about revealing the location of the gun. He left Jackson in the presence of the other officers, including Clifford, and entered the apartment to speak with Belanger, who at that point was speaking with Gudas in the kitchen. Campbell explained to Belanger why he and the other officers were there, and asked Belanger to consent to a search of her apartment. Belanger agreed to allow Campbell and the other officers to search her apartment, and signed a valid search consent form. According to Belanger, this took no more than "five or ten minutes." Suppression Hr'g Tr., April 17, 2007 at 3:29 p.m. Lacombe testified that Campbell "was in and out." Suppression Hr'g Tr., April 17, 2007 at 3:43 p.m.

With the consent form in hand, Campbell, instead of initiating his search, returned to Jackson and the other officers on the landing and declared out loud that he now had consent to search the apartment. According to Campbell, he did so with the intention of giving Jackson "a chance to possibly come clean." Suppression Hr'g Tr., April 17, 2007 at 1:28 p.m. It is not clear from the record whether the officers further questioned Jackson at this point. In any event, Jackson told Campbell that he had lied earlier and informed him that the gun was hidden in a cereal box in the kitchen refrigerator. Campbell searched the refrigerator,

- 5 -

found the stolen gun and another gun on the bottom shelf in a box of Fruity Pebbles, and placed Jackson under arrest.

The officers escorted Jackson in a marked police cruiser to the Lewiston police station and, later that morning,[1] brought him to an interrogation room.  Campbell and Clifford--the same two officers who had questioned Jackson earlier at the apartment--met Jackson in the interrogation room.  Campbell read Jackson his Miranda rights, and Jackson signed a valid waiver of those rights before he made additional incriminating statements.  Campbell and Clifford then began interrogating Jackson about his involvement with the stolen gun.  Here, Jackson admitted that he received the gun from Mancuso but insisted that he obtained the gun for cash, and not for drugs.  He also denied knowing that the gun was stolen.

Jackson was charged with possession of a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Jackson moved to suppress the statements he made at the apartment and at the police station, as well as the physical evidence (the two guns) obtained at the apartment.  With respect to the statements made at the apartment, Jackson argued that those statements were obtained in violation of Miranda.  With respect to the guns, Jackson argued that they were obtained as a fruit of the illegally obtained statements.  And with respect to the statements made at the police

_____

[1]      Campbell testified that Jackson was brought directly to the station from the apartment, and then directly to an interrogation room.  Based on the record, this later questioning must have occurred soon after the questioning at the apartment.

- 6 -

station, Jackson argued that those statements were tainted by the earlier improperly secured confession at the apartment.

After a hearing on Jackson's motion to suppress, the magistrate judge entered a recommended decision, holding that the statements made to Campbell at the apartment were admissible. United States v. Jackson, No. 06-94-P-S, 2007 WL 1378378 (D. Me. May 7, 2007) ("Recommended Decision"). In doing so, the magistrate noted that, although Jackson was not formally under arrest, the government conceded that the statements at the apartment were made while Jackson was in custody. The magistrate judge rejected Jackson's testimony on the issue of interrogation,[2] finding Jackson's account not credible to the extent that it conflicted with the officers' testimony. The magistrate judge found that Jackson's statements (that is, his false statement that the gun was elsewhere and his true statement that the gun was hidden in a cereal box in the refrigerator) were not made in response to interrogation, because Jackson did not give up the location of the gun in response to any "particular question." Determining that at the police station Miranda warnings had been provided, the magistrate judge also concluded that the statements at the police station were admissible. However, the magistrate judge suppressed a statement Jackson had made in response to Gudas, who had asked

---

[2]     Jackson testified, inter alia, that (while Campbell was in the apartment) Clifford threatened to report any failure to cooperate to the federal prosecutor, and that his statements at the police station were made before the Miranda warnings.

Jackson why he needed a firearm. (Since that statement is not at issue in this appeal, we do not discuss it further.) The district court adopted the magistrate's recommended decision in full.

Jackson pled guilty to the charges but, pursuant to Rule 11(a)(2), preserved his right to appeal the suppression ruling. The district court entered final judgment on September 26, 2007, sentencing Jackson to 180 months of confinement, followed by five years of supervised release, and a special assessment of $100. Jackson timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The sole issue on appeal is whether Jackson's statements and guns should be suppressed because the police failed to comply with the requirements of Miranda. Miranda requires law enforcement officers to employ procedural safeguards to ensure that a suspect's Fifth Amendment privilege against self-incrimination is respected. 384 U.S. at 478-79; Dickerson v. United States, 530 U.S. 428, 444 (2000) (holding that Miranda announced a constitutional rule). Under Miranda, a suspect is entitled to be apprised of his "right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479. To comply, the police must give a suspect proper Miranda warnings before he is subjected to custodial interrogation.

- 8 -

Id. Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed. Id.; United States v. Conley, 156 F.3d 78, 83 (1st Cir. 1998). We review the district court's findings of fact for clear error, and the court's ultimate legal and constitutional conclusions de novo. Conley, 156 F.3d at 82.

**A.**

We first address the statements that Jackson made at the apartment. There is no dispute that Jackson was never given Miranda warnings at any point prior to the questioning that took place at the police station--well after the encounter at the apartment. We must therefore decide whether Jackson's statements at the apartment were the result of custodial interrogation. Custodial interrogation requires that the defendant was both "in custody" and subjected to "interrogation." United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002); United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). Here, although Jackson was not formally placed under arrest before he made the statements, the government conceded that Jackson was in custody at the time that he made the incriminating statements. That leaves us only with the critical question whether Jackson was subjected to interrogation.

In Rhode Island v. Innis, the Supreme Court construed interrogation to be "either express questioning or its functional equivalent." 446 U.S. 291, 300-01 (1980). Interrogation can be "any words or actions on the part of the police (other than those

- 9 -

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Id. A volunteered statement is not the product of interrogation and is not subject to suppression, even if warnings have not been provided. Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

We focus first on Jackson's statement that the gun was in a cereal box in the refrigerator. Here Jackson did not make that statement directly in response to Campbell's initial questioning. Instead, that statement was made only after Campbell returned to the landing and announced that he had Belanger's consent to search the apartment. The district court held that Jackson's statement that the gun was in the refrigerator was voluntary and not the result of interrogation. In doing so, the district court relied on the fact that Jackson did not make the statement in response to any "particular question." Recommended Decision, at *4 ("None of the other officers called to testify by the defendant remembered Campbell asking the defendant where the gun was or any other particular question."). In our view, the district court applied an incorrect standard. A statement is not rendered admissible under Miranda simply because it is not made in response to a "particular

- 10 -

question." The entire course of conduct of the officers must be examined to determine whether the statement was in response to unlawful questioning under <u>Miranda</u>.

In <u>Innis</u>, the Court found that there had been "no express questioning" and refused to treat as "interrogation" under its functional equivalent test a conversation between police officers in the presence of the defendant that arguably was both intended to provoke, and did in fact provoke, an admission by the defendant. 446 U.S. at 302. We need not decide how <u>Innis</u> would apply in this case if the consent-to-search statement by Campbell by itself had been the cause of Jackson's statement. Rather, we find that Jackson's statement was the product of the unwarned interrogation.

Even if the officers did not reinitiate questioning after Campbell returned from the apartment (as the District Court found in resolving conflicting testimony),[3] as we now discuss there remain as incontestable facts the following: questioning by the

---

[3]    We note that Campbell's testimony indicates that he may have reinitiated questioning after he had Belanger's consent to search:

> Q    Well, when you came back outside to talk to him with the consent to search, you were given him another chance to tell you where the guns were; correct?
>
> A    Actually <u>I didn't question him much more</u>. I just said I had consent to search and at that point he stated he lied.

Suppression Hr'g Tr., April 17, 2007 at 2:15-16 p.m. Also, Lacombe recalled that Campbell, upon returning to the landing, continued talking to Jackson. Suppression Hr'g Tr., April 17, 2007 at 3:43-50 p.m.

- 11 -

officers _before_ Campbell's departure and return, the short period between the initial questioning and the time that Jackson made the statement, the suggestion of leniency, Jackson's prior knowledge that the search was permissible, and the officers' obvious purpose in the earlier questioning to secure an incriminating statement from Jackson. In these circumstances, it is a fair inference that it was the earlier questioning that prompted Jackson's ultimate admission.

First, it is clear from the testimony of the officers that they questioned Jackson about the gun. Officer Campbell admitted that he engaged in an "interviewing process" to "try to get information." Suppression Hr'g Tr., April 17, 2007 at 2:16 p.m. Officer Campbell testified that when he and the other officers arrived at the apartment, he "asked [Jackson] of his involvement" with the gun.[4] Suppression Hr'g Tr., April 17, 2007

---

[4]    Campbell testified:

Q    What, if anything, did you then tell the defendant about your investigation and why you were there?

A    I advised him that I was investigating a stolen firearm complaint and _asked of his involvement_ in it.

Q    Did you describe specifically to the defendant what you knew to date up to that point in time, what you knew about the stolen firearm?

A    Um, I believe I did.

Q    Specifically, did you describe to him what Mr. Mancuso had told you about the exchange of the firearm for crack cocaine?

- 12 -

at 1:22 p.m.  Campbell also stated: "I questioned him on the guns because I did want a response in regard to guns, to finding the guns."  Suppression Hr'g Tr., April 26, 2007 at 3:34 p.m.  Lacombe also recalled that the "nature of that discussion was [the officers] asking [Jackson] questions."[5]  Suppression Hr'g Tr.,

---

A     Yes.

Suppression Hr'g Tr., April 17, 2007 at 1:22 p.m. (emphasis added).

[5]     Lacombe testified:

Q     Do you remember why he was there?  Why you were there?

A     I was there to assist Agent Campbell in questioning Mr. Jackson, I believe.

Suppression Hr'g Tr., April 17, 2007 at 3:40 p.m. (emphasis added). On redirect, Lacombe stated:

Q     Well, you were there when the discussion was going on with David Jackson, Campbell yourself and the other officers; correct?

A     Yes.

Q     And the nature of that discussion was them asking him questions; right?

A     Yes.

. . . .

Q     She [the federal prosecutor on cross-examination] said do you remember anybody discussing - - coercing him and you really don't remember the nature of the conversations; do you?

A     Yes.  I remember the nature of the conversation. We were there looking for a firearm so the conversation was to find this - - these firearms that we were looking for.  So, but I don't, you know, I know the nature of the questions, but exactly what questions were asked, how they were

April 17, 2007 at 3:55 p.m. The officers agreed that Jackson was questioned in order to elicit an incriminating response. That is, Campbell wanted Jackson to tell him where he had hidden the gun.

Second, the time between the initial interrogation and the incriminating statement was no more than a few minutes. Lacombe testified that Campbell was "in and out" and that the entire incident from the time the police arrived to the time that Jackson made the statement was about fifteen minutes. Belanger estimated that, after the initial questioning, Campbell spent no more than five or ten minutes with her in the apartment to get her consent to search.

Third, Campbell's testimony indicates that in the course of these discussions, the officers hinted that Jackson's cooperation would be rewarded with leniency. Campbell testified:

Q    Is it fair to say based on your recollection of your conversations with the defendant based on what you heard him say, that you said something that intimated that you wanted him to cooperate or just tell you where the guns were and help himself out?

A    I questioned him on the guns because I did want a response in regard to guns, to finding the guns.

Q    And might you have used the word "cooperation"?

---

presented, no I wouldn't, I don't recall that.

Q    But you had said they were questions?

A    They were questions.

Suppression Hr'g Tr., April 17, 2007 at 3:55-56 p.m. (emphases added).

- 14 -

A    I may have.

Q    Might you have used the word "<u>leniency</u>"?

A    I may have.

Q    And <u>might you have indicated that in some way, that cooperation would be reported back to a prosecutor down the road</u>?

A    <u>Absolutely</u>.

Suppression Hr'g Tr., April 26, 2007 at 3:34 p.m. (emphases added).

Fourth, the authority of the police to search the apartment was not new information for Jackson. Jackson himself testified, without contradiction, that he already knew that a search was permissible without any further consent because his probation officer had the right as a condition of his probation.[6]

Finally, Campbell testified that when he left Jackson outside on the landing with the other officers and went inside to speak with Belanger, he did so in order to give Jackson a chance to "think about" cooperating.[7] And, once Campbell had obtained

_____

[6]    The relevant testimony, cross examination of Jackson by AUSA McElwee, confirmed Jackson's view that the probation officer "already had consent when my probation officer came inside the apartment because she already said [sic] it." Suppression Hr'g Tr., April 17, 2007 at 4:41-42 p.m. Jackson also testified:

> Q    When they first arrived at the door, they didn't just knock on the door, have it be opened and start searching.
> A    No. Pauline Gudas told me that she was coming to search the house. She was my probation officer at the time.

<u>Id.</u>

[7]    Campbell stated:

> Q    And then you wrote in your report I gave him some

- 15 -

Belanger's consent to search the apartment and returned to the

landing to announce that fact, he did so because he "wanted to give

[Jackson] a chance to possibly come clean."[8]  Suppression Hr'g Tr.,

_____

time to think about this, and asked Belanger if I could speak to her inside the apartment.

A    Correct.

Q    And when you said "think about it," basically he was failing to do what you wanted him to do, tell you where the gun was; correct?

A    I wanted him to cooperate, yes.

Q    And he wasn't being cooperative at this time?

A    Not at that time, no.

Q    And what you wanted him to do was to think about it so that maybe later on he would be cooperative; correct?

A    Absolutely.

Q    And this was part of what you had been trained to do as the investigating officer; correct?

A    It's part of it, yes.

Suppression Hr'g Tr., April 17, 2007 at 2:07-08 p.m. (emphases added).

[8]    Campbell testified:

Q    After Ms. Belanger gave you consent to search her apartment, did you immediately begin searching or did you go back outside to speak with Mr. Jackson?

A    I went back outside and spoke with Mr. Jackson.

Q    Why did you do that?

A    I wanted to give him a chance to possibly come clean on anything that may be inside the apartment, advising that I had consent to search.

- 16 -

April 17, 2007 at 1:28 p.m.

In summary, it is true that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." Innis, 446 U.S. at 299. This is not a case, however, where the defendant's statement was clearly unresponsive to an officer's inquiries. See, e.g., United States v. Castro, 723 F.2d 1527, 1530 (11th Cir. 1984) (holding that a statement that was "totally unresponsive" to the officer's question was not improperly compelled, but rather "spontaneously volunteered"). Nor is it the case that Jackson simply blurted out the incriminating statement without prompting. See, e.g., United States v. Richardson, 427 F.3d 1128, 1133 (8th Cir. 2005)(holding that the defendant's statement in the back of the police car was voluntary), vacated in part on other grounds, 439 F.3d 421 (8th Cir. 2006).

Rather, we think it clear that the police subjected Jackson to custodial interrogation at the apartment in violation of Jackson's Fifth Amendment right and that the statements were obtained in violation of Miranda. We also conclude that Jackson's false statement that the gun was elsewhere is even more clearly inadmissible. As to that statement, the officers' testimony indicates that that statement was made directly in response to questioning--specifically Campbell's asking Jackson of his

Suppression Hr'g Tr., April 17, 2007 at 1:28 p.m. (emphasis added).

- 17 -

involvement with the stolen firearm.[9]

**B.**

The statements made at the police station are a different matter.  The district court found that Jackson made those statements after receiving proper <u>Miranda</u> warnings, and on appeal Jackson does not challenge that finding.

The Supreme Court in <u>Oregon</u> v. <u>Elstad</u> made clear that there is no automatic rule requiring the exclusion of later statements made after a proper <u>Miranda</u> warning, even though earlier similar statements must be excluded because of a <u>Miranda</u> violation. 470 U.S. 298, 314 (1985).  An earlier "simple failure to administer the [<u>Miranda</u>] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will [does not] so taint[] the [later] investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." <u>Id.</u> at 309. Thus, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  <u>Id.</u>; <u>see also</u> <u>United States</u> v. <u>Byram</u>, 145 F.3d

---

[9]    The government also argues that the statements at the apartment are admissible, even if they were the product of custodial interrogation, under the public safety exception to <u>Miranda</u>'s suppression requirement. <u>See</u> <u>New York</u> v. <u>Quarles</u>, 467 U.S. 649 (1984).  The government's contention is without merit. The gun, stuffed inside a cereal box in the refrigerator, was clearly outside of the reach of Jackson, who was not even in the apartment and, in any event, was surrounded by a number of police officers.  The mere fact that a gun was involved is not sufficient.

405, 409 (1st Cir. 1998).

In these circumstances, the "finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Elstad, 470 U.S. at 318.

It may well be, under Elstad, that Jackson's statements made at the police station are admissible despite the earlier Miranda violation. But we think that the best course is to remand to the district court to consider the admissibility of the statements at the police station in light of our holding that the apartment statements are inadmissible.

## C.

Jackson also argued below that the two guns should be suppressed because they were tainted by the constitutional violation. We disagree. The Supreme Court has held that physical evidence need not be excluded simply because it is discovered as a result of unwarned questioning in violation of Miranda. See United States v. Patane, 542 U.S. 630, 634, 637-44 (2004) (Thomas, J., plurality); id. at 644-45 (Kennedy, J., concurring in judgment).

## III.

Jackson's conviction and sentence are vacated and the case is remanded for proceedings consistent with this opinion.

Vacated and Remanded.