16-2334-cr
*United States v. Familetti*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2017
No. 16-2334-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

CHARLES FAMILETTI, JR., AKA CHARLES FAMILETTI,
*Defendant-Appellant*.

ARGUED: OCTOBER 23, 2017
DECIDED: DECEMBER 20, 2017

Before:     JACOBS, SACK, and PARKER, *Circuit Judges*.

Charles Familetti appeals from the judgment of the United States District Court for the Southern District of New York, sentencing him to 15 years in prison for attempted sex trafficking of a minor and the possession, distribution, and transportation of child pornography.   Familetti challenges his conviction on grounds that he was in custody and that the police elicited his offer to cooperate in the investigation as the opening gambit in a two-step evasion of the Miranda rule forbidden by Missouri v. Seibert, 542 U.S. 600 (2004).   We conclude that the circumstances and phrasing of the pre-warning request for cooperation would have constituted an interrogation under Rhode Island v. Innis, 446 U.S. 291 (1980), if Familetti had been in custody, but that under circuit law, he was not. Affirmed.

JESSICA K. FENDER, Assistant United States Attorney for the Southern District (*with* Patrick Egan, Karl Metzner, *on the brief*), New York, New York, *for the United States of America*.

JERALD BRAININ, ESQ., Los Angeles, California, *for Defendant-Appellant*.

DENNIS JACOBS, *Circuit Judge*:

Charles Familetti, a former financial executive at HSBC Holdings plc, was a target of an undercover investigation into child pornography and sex crimes on the internet. An FBI sting operation culminated in a lawful search of the appellant's apartment during which (Familetti contends) statements were elicited in violation of the Fifth Amendment. Familetti challenges his conviction on grounds that he was in custody and that the police elicited his offer to cooperate in the investigation as the opening gambit in a two-step evasion of the <u>Miranda</u> rule forbidden by <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004) . We conclude that the circumstances and phrasing of the pre-warning request for cooperation would have constituted an interrogation under <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), if Familetti had been in custody, but that under Circuit law, he was not. Because Familetti was not in custody when the FBI conducted a pre-warning interrogation, we affirm the conviction.

## BACKGROUND

### I

Familetti participated in chat sessions, using a pseudonym, on an online service called GigaTribe. In June 2013, Special Agent Thomas Thompson engaged Familetti in a chat during which Familetti sent child pornography videos to Thompson and expressed interest in a sexual experience with a minor. Thompson offered to arrange an encounter with an eleven-year-old. Special

2

Agent Aaron Spivack, posing as Thompson's online persona, met with Familetti in person, and they contracted for Spivack to deliver a child to Familetti's corporate apartment for $500. At the conclusion of the meeting, Familetti gave Spivak $100 as a down payment. At the agreed time, Spivack arrived at the apartment with a task force led by Thompson, which executed a search warrant.

Familetti suffered an extreme panic attack as the agents entered, and two agents were needed to restrain him, push him against the wall, and temporarily handcuff him. The agents placed him in a chair in his living room, brought him a glass of water, and waited for him to calm down. Agent Thompson then explained to Familetti that he was not under arrest and was "free to leave," but that the agents had a warrant to search the apartment and might take some things. App'x at 74. When Familetti's panic subsided, the handcuffs were removed; he was led into his bedroom, and advised again that he was not under arrest. Thompson then told Familetti "that the reason why we're here is related to child pornography" and that the "number one goal is to find those people out there who are raping children and making these type of videos." App'x at 76. Although the record does not reflect the precise exchange that followed, it is undisputed that Thompson asked for Familetti's help with the investigation, and that Familetti stated that he was willing. See App'x at 76 (A: "And then I told [Familetti] ... maybe he could help us provide some information in finding these people."); Appellant's Br. at 7 (stating "Familetti immediately agreed to cooperate"); Appellee's Br. at 5 (stating "Familetti said that he was willing to talk to the agents").

Thereupon, Thompson advised Familetti of his Miranda rights orally and in writing, and elicited Familetti's waiver. In the ensuing interview, Familetti confessed to using an online account to trade child pornography, storing child pornography on an SD card hidden in his apartment, and making a $100 down payment for sex with a minor.

## II

The defense unsuccessfully moved to suppress the oral and written

statements Familetti made during the search of his apartment. Familetti argued that his pre-warning statement was inadmissible as the product of a custodial interrogation, and that any subsequent waiver (and confession) was elicited by a deliberate two-step interrogation process, and was therefore neither knowing nor voluntary. See Missouri v. Seibert, 542 U.S. 600, 615 (2004). We review the district court's factual findings on the existence of a custodial interrogation for clear error, and its legal conclusions *de novo*. United States v. Romaszko, 253 F.3d 757, 760 (2d Cir. 2001).

## DISCUSSION

Absent a warning, the prosecution may not use a statement elicited by the police during a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 448-50 (1966); see also United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004); United States ex rel. Hines v. La Vallee, 521 F.2d 1109, 1112 (2d Cir. 1975). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody…." Miranda, 384 U.S. at 444. A person must both be "in custody" and subject to "interrogation" for Miranda safeguards to apply. See Rhode Island v. Innis, 446 U.S. 291, 300 (1980) ("'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

## I

An interrogation occurs when a suspect "is subjected to either express questioning or its functional equivalent" and his statements are "the product of words or actions on the part of the police" that "were reasonably likely to elicit an incriminating response." Id. at 300-01, 303. Familetti contends that he was under interrogation in his bedroom because the agent posed a direct question calculated to draw an incriminating response. The agents informed him that they were there to uncover activities related to child sex and pornography. Thompson testified that he asked Familetti if he could help the agents with their investigation into who was "raping children," and that Familetti agreed to do so. The Government responds that no interrogation took place because asking for cooperation is not a manner of questioning "reasonably likely to elicit an incriminating response."

4

Not all questioning of a suspect by the police amounts to interrogation. Some "question[s] [are] necessary to secure their own safety or the safety of the public." New York v. Quarles, 467 U.S. 649, 658-59 (1984). Likewise, "pedigree" questions that pertain to administration or a defendant's basic identification information do not trigger Miranda. See Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005) (noting the "general rule that pedigree questioning does not fall under the strictures of Miranda"); accord United States v. Kane, 726 F.2d 344, 349 (7th Cir. 1984) ("[A] Miranda interrogation violation does not occur when arresting officers question a defendant only to a limited extent for data required as part of the processing normally attendant to arrest and custody."). And "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Miranda, 384 U.S. at 478.

Along these lines, we have questioned whether a request from the police for cooperation or assistance can be interrogation. In United States v. Guido, we rejected "the proposition that a discussion of cooperation is *inherently* a form of questioning for the purposes of Miranda." 704 F.2d 675, 677 (2d Cir. 1983) (emphasis added). In that case, the defendant was not subject to the "functional equivalent" of express questioning when the agents discussed the possibility of cooperation while they took him to the police station in a squad car. Id. Engaging defendants with pre-warning or pre-counsel cooperation inquiries is by no means an uncommon technique in this Circuit. See App'x at 76 (in describing his solicitation to Familetti to assist with finding the child pornographers, Agent Thompson responded "[t]hat's my typical standard opening line"); United States v. Annucci, No. 06 Cr. 982(BSJ), 2007 WL 1310156, at *5 (S.D.N.Y. May 3, 2007); see also United States v. Vado, 87 F. Supp.3d 472, 476 (S.D.N.Y. 2015).

"[A]lmost any information obtained from a suspect, however innocuous it appears on its face, may prove to be incriminating..." United States ex rel Hines, 521 F.2d at 1112. The Supreme Court has cautioned that the "interrogation environment" is not to be construed so narrowly as to defeat Miranda's purpose: various "techniques of persuasion, no less than express questioning" can amount to interrogation. Innis, 446 U.S. at 299 (internal

5

citation omitted). Interrogation therefore includes engagement short of a formal interview. Just as some "safety" related inquiries will invade a defendant's Fifth Amendment rights, see Orozco v. Texas, 394 U.S. 324, 325 (1969) (ruling inappropriate pre-Miranda police questioning about whether the suspect owned a pistol and the location of the weapon), a defendant's undertaking that he will help or cooperate in an investigation (or not) can sometimes implicate the defendant in the crime or in that criminal universe. The cooperation inquiry can also result in more significant incriminating consequences as the first step of "[t]he technique of interrogating in successive, unwarned and warned phases." Missouri v. Seibert, 542 U.S. at 609. "[I]nterrogation practices" such as the one at issue in this case may "disable an individual from making a free and rational choice about speaking," negating the constitutional force of subsequent Miranda warnings. Id. at 611 (quoting Miranda, 384 U.S. at 464-65). Thus the cooperation inquiry can become a tool to evade substantive Fifth Amendment protections.

The first principle is that "not ... all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." Innis, 446 U.S. at 299-300. In Innis, the defendant volunteered a damaging statement after overhearing a conversation between two police officers. Id. at 302-03. But courts have been cautious about extending Innis to additional forms of pre-warning conduct in which the police pose direct questions. See United States v. Jackson, 544 F.3d 351, 358-60 & n.4 (1st Cir. 2008) (distinguishing Innis from questioning suspect about his "involvement in" a stolen firearm complaint); United States v. Edwards, 885 F.2d 377, 385-86 (7th Cir. 1989) (declining to establish "any general rule that questioning defendants about their employment always falls outside the reach of Miranda"); United States v. Hunter, 708 F.3d 938, 947-48 (7th Cir. 2013) (holding that when detective asked suspect what he would like to tell his parents on the phone after a shooting incident "reasonably likely to elicit an incriminating response"). A blanket rule allowing the police to solicit cooperation prior to Miranda warnings is not inferable from Innis; nor, for that matter, is it dictated by Guido.

Guido does not foreclose the conclusion that a solicitation to cooperate or assist can be inculpatory. The Guido opinion emphasized facts mitigating the

6

likelihood that the defendant would offer an incriminating response.[1]   Cf. Jackson, 544 F.3d at 359-60 (citing an officer's invitation to cooperate as evidence of interrogation).   Guido rejected the idea that an agreement to cooperate is "inherently" incriminating under Innis; the negative pregnant is that asking a suspect to assist or cooperate *can sometimes* be incriminating, depending on circumstances.   Soliciting cooperation from potential suspects of course has an essential role in criminal investigations; moreover, "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials," United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) (internal quotation marks and citation omitted).   At the same time, a request to "help" or "cooperate" in an investigation may be treated as interrogation for the purposes of Miranda if: there is no concern about officer or public safety; the officers have volunteered the specific criminal behavior at issue; the officers have given the defendant good reason to believe that he is suspected of participating in or having special knowledge of criminal conduct; and an undertaking to help or cooperate necessarily bespeaks criminal involvement.[2]   Fifth Amendment concerns are especially lively when the behavior alleged is highly antisocial or idiosyncratic, such as (as here) the molestation of minors and the sharing of child pornography.   A suspect's agreement to cooperate is incriminating if by that agreement he has placed himself in that world.

Here, the government has stressed Guido to its breaking point.   After invading Familetti's apartment to serve a search warrant, the agents informed him that they were looking for perpetrators of child pornography, and asked him

---

[1]Although the agents suggested the defendant could cooperate with law enforcement, they "also told him that he should discuss the possibility [of cooperation] with his attorney, and indicated that [he] would not be questioned about the case at that time."   Guido, 704 F.2d at 677.

[2]When evaluating whether questioning constitutes interrogation, attention is properly paid to "the perceptions of the suspect" in the questions and answers, "rather than the intent of the police."   Innis, 446 U.S. at 301; see also United States v. Zahrey, 963 F. Supp. 1273, 1281 (E.D.N.Y. 1997).   Whether the police intend to elicit incriminating information is of no moment so long as they should have known that their actions were likely to do so.

for information.   They left no doubt that Familetti was suspected of criminal involvement, and his response would more than likely confirm as much.   We are therefore persuaded that the FBI agents' affirmative request for Familetti to help them investigate child pornography constituted interrogation.

**II**

The question remains whether Familetti was in custody at the moment he was asked about cooperation.   While the disputed facts present a close case, the testimony credited by the district court establishes that Familetti was not in custody during any pre-<u>Miranda</u> interrogation.   <u>See</u> <u>United States v. Badmus</u>, 325 F.3d 133, 139 (2d Cir. 2003).

"The 'ultimate inquiry' for determining <u>Miranda</u> custody ... is that articulated by the Supreme Court in <u>California v. Beheler</u> [463 U.S. 1121, 1125 (1983) (per curiam)]:   whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."   <u>United States v. Newton</u>, 369 F.3d 659, 670 (2d Cir. 2004) (internal citations and quotation marks omitted).   As a formal matter, Familetti had not been placed under arrest when he made the pre-<u>Miranda</u> statements at issue.   In evaluating whether the degree of a restraint is custodial, we look to whether "a reasonable person in the suspect's shoes would not have felt free to leave under the circumstances." <u>United States v. Ali</u>, 86 F.3d 275, 276 (2d Cir. 1996) (internal quotation marks and citation omitted); <u>see</u> <u>Georgison v. Donelli</u>, 588 F.3d 145, 156 (2d Cir. 2009) (emphasis in original) (evaluating the totality of the circumstances to determine whether "a reasonable person would have *thought he was free to leave the police encounter*...").   "In the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave," <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir. 1992), or that he is "completely at the mercy of the police."   <u>Newton</u>, 369 F.3d at 675 (internal quotation marks and citation omitted).

Circumstances identified as indicative cut against finding a restraint comparable to formal arrest in this case.

Familetti was in his own home at the time of initial interrogation.

8

"[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." Newton, 369 F.3d at 675; see also Mitchell, 966 F.2d at 99; United States v. Rakowski, 714 F. Supp. 1324, 1334 (D. Vt. 1987) ("Lower courts ... almost universally hold that questioning in a suspect's home is not custodial ...").

The officers advised Familetti several times that he was not under arrest and was free to leave. Such advice, while not dispositive, is probative in "assessing the extent to which a reasonable person would understand any restraints on his freedom." Newton, 369 F.3d at 676; see, e.g., United States v. Palase, No. 11-CR-413 (SLT), 2014 WL 6802560, at *6 (E.D.N.Y. Dec. 2, 2014); United States v. Bershchansky, 958 F. Supp. 2d 354, 382–83 (E.D.N.Y. 2013), aff'd, 788 F.3d 102 (2d Cir. 2015) ("[T]he court finds that the government agents informed defendant he was not under arrest and was free to leave at the time of the search, factors establishing that defendant could not reasonably understand that he was in custody."). There is no evidence that Familetti ever asked or tried to leave the interview. See United States v. Faux, 828 F.3d 130, 139 (2d Cir. 2016) (noting the suspect "did not seek to end the encounter, or to leave the house" during questioning); United States v. Lifshitz, No. 03 CR. 572(LAP), 2004 WL 2072468, at *7 (S.D.N.Y. Sept. 15, 2004).

Familetti argues that he lacked any real option to leave, the agents' assurances notwithstanding. He points primarily to Agent Thompson's testimony; when asked what would have happened if Familetti tried to leave, Thompson said he would have had to "consider his options." Appellant's Br. at 17 (quoting App'x at 126). But the inquiry into custodial status is objective, and does not turn on "the subjective views harbored by ... the interrogating officers." Stansburg v. California, 511 U.S. 318, 323 (1994); see Mitchell, 966 F.2d at 98 (custody status determined by the "presence or absence of affirmative indications that the defendant was not free to leave").

Nor does the evidence indicate that Familetti was so severely intimidated or coerced while he conversed with the agents in his bedroom that a reasonable person in his position "would feel that he was completely at the mercy of the police." Newton, 369 F.3d at 675 (internal citation and quotation marks omitted);

9

United States v. Pollaro, 733 F. Supp. 2d 364, 370-371 (E.D.N.Y. 2010).   The agents restrained Familetti when he was in the grip of his initial panic; but under such conditions "a certain level of restraint is acceptable in the course of a reasonable investigative detention."   United States v. Nguyen, No. 2:05CR130-3, 2006 WL 2260104, at *8 (D. Vt. Aug. 7, 2006) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)); see also United States v. Cota, 953 F.2d 753, 758-59 (2d Cir. 1992) (concluding that the defendant was not in custody where the "initial use of guns and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as soon as ... the perceived safety threat abated").   "Handcuffs are generally recognized as a hallmark of a formal arrest," and it may be that for several minutes in the living room Familetti was in custody.   Newton, 369 F.3d at 676; see also Dunaway v. New York, 442 U.S. 200, 215 & n. 17 (1979).   But even Familetti concedes that the handcuffs came off before Agent Thomson began interrogating him in the bedroom.   His initial restraints cannot establish a state of custody for the duration of his interactions with the police.   See Bershchansky, 958 F. Supp. 2d at 383 ("Even the use of handcuffs prior to an interrogation, however, does not automatically render the interrogation custodial."); see also Cota, 953 F.2d at 758-59.

Familetti responds that nine agents swarming his apartment was so inherently intimidating that no one would reasonably believe he was free to leave.   However, the presence of the agents in Familetti's dwelling to execute the search warrant does not render Thompson's questioning custodial.   See Faux, 828 F.3d at 137 (holding that "absent other hallmarks of custody," a "reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution"); cf. Newton, 369 F.3d at 675 (The presence of numerous officers "would not, by itself, have led a reasonable person in [defendant's] shoes to conclude that he was in custody.").

Faux is analogous.   Approximately ten to fifteen agents executed a search warrant at the defendant's home while she was being questioned for hours at her dining table.   Faux, 828 F.3d at 132-34.   We held that Faux was not in custody while agents "swarmed about her home" because she was never told she was not free to leave, the tone of the questioning was conversational, and no weapons

10

were displayed.   <u>Id.</u> at 138-39.   Similarly, after Familetti subsided from his initial distress, the agents engaged him in a tone that was (as the district court found) non-confrontational.   Familetti was not restrained when the two agents sat with him in his bedroom to discuss cooperation; the agents' weapons were never drawn; and the pre-<u>Miranda</u> interview lasted at most several minutes.   <u>See, e.g.,</u> <u>Vado</u>, 87 F. Supp. 3d at 479 (concluding the suspect was not in custody where the interview lasted "no more than 40 minutes, [he] was not restrained, and the agents' weapons were not drawn"); <u>Faux</u>, 828 F.3d at 138-39 (ruling "the circumstances of Faux's interrogation militate against a finding of custody" over a two hour interview).

Familetti was thus not under custodial interrogation at any time before he received his <u>Miranda</u> warnings.

### III

Because Familetti was not subject to a pre-warning custodial interrogation, we do not reach his corollary argument regarding a deliberate two-step interrogation.   <u>See Missouri v. Seibert</u>, 542 U.S. at 612 (finding post-<u>Miranda</u> confessions can be involuntary specifically in circumstances where law enforcement elicited a "first, unwarned and inadmissible segment" of incriminating evidence).

### CONCLUSION

For the foregoing reasons, we hereby **AFFIRM** the judgment of the district court.