# United States Court of Appeals
## For the First Circuit

No. 15-1495

UNITED STATES OF AMERICA,

Appellee,

v.

LAMAR YOUNG,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Edward S. MacColl, with whom Thompson, Bull, Bass & MacColl, LLC, P.A. were on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty, II, United States Attorney, was on brief, for appellee.

August 19, 2016

**THOMPSON**, **Circuit Judge**. Defendant-appellant Lamar Young (Young) entered a conditional guilty plea and was convicted of conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a) & (b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Before us, Young challenges the district court's denial of his motion to suppress evidence obtained by law enforcement officers while executing a warrant for his arrest. Young argues that the evidence was improperly seized when the officers entered his girlfriend's apartment without consent. After careful consideration, we conclude that the officers had insufficient grounds to reasonably believe that Young lived at or would be present at the apartment and, therefore, lacked the necessary level of belief to justify entering the apartment to execute the arrest warrant without consent. Accordingly, we vacate Young's conviction, reverse the district court's denial of his motion to suppress, and remand for further proceedings.

## I.

We recite the key facts as found by the district court,[1] consistent with the record support, noting where relevant Young's

---

[1] The suppression hearing was held before a magistrate judge. Young objected to the magistrate judge's recommended decision, but the district court adopted the magistrate judge's factual findings and legal conclusions, and denied Young's motion to suppress. To

- 2 -

contrary view of the testimony presented at the suppression hearing.  See, e.g., United States v. Werra, 638 F.3d 326, 328 (1st Cir. 2011).

On March 11, 2014, the district court issued an arrest warrant for Young following his indictment for conspiring to distribute and possess with intent to distribute "28 grams or more of a mixture or substance containing a detectable amount of cocaine base."  That evening, six Lewiston, Maine law-enforcement officers set out in search of Young, traveling to three different residences and making four different stops, before finally locating Young at a fourth location.  The search team included Lewiston police officer and United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) task force officer Ryan Rawstron (Rawstron), Maine State Police trooper Thomas Pappas (Pappas), who was assigned to the Maine Drug Enforcement Agency (MDEA), Lewiston police officer and MDEA task force officer Tyler Michaud (Michaud), Joey Brown (Brown) from the Lewiston Police Department, Auburn police officer David Madore (Madore), and trooper Kevin Rooney (Rooney) from the Maine State Police Department (collectively, and for simplicity's sake, we will refer to the task force officers, police officers, and trooper as "officers").

---

simplify, we refer to the magistrate judge's findings and conclusions as those of the district court.

The officers began their search at the Howe Street residence of Kayla Davidson (Davidson), where the officers had located Young during a prior investigation. Officer Rawstron had also spoken with Davidson "shortly before" that night, and Davidson had informed him during that conversation that she was dating Young. Davidson had further informed officer Rawstron that Young had stayed with her at another apartment on Ash Street. Neither Young nor Davidson was at the Howe Street apartment when the officers arrived. The officers then decided to check the Ash Street apartment, where Young and Davidson had previously stayed with another woman, Stephanie Webster (Webster). Young and Davidson were not at the Ash Street apartment either.

At this point, the officers traveled to the residence of yet another woman, Crystal, who lived on Horton Street. The officers apparently "had information" that Young had, at some point in the past, also been staying with Crystal. Officer Rawstron testified at the suppression hearing that the officers "were familiar with" Crystal and the Horton Street address because they "had [] done a controlled buy at that . . . address . . . fairly shortly before." When the officers arrived, Crystal was there, with someone she was dating (not Young), but Young was, once again, not present.

Out of ideas, and having failed to locate Young — or Davidson — thus far, the officers circled back to where they had

- 4 -

begun their night, Davidson's Howe Street apartment. This time they ran into Webster, whose Ash Street apartment they had visited earlier in the evening. Webster, in exchange for the officer's promise to forgo taking her to jail that night on outstanding warrants and instead allow her to turn herself in the following day, told them that if Young was not at her apartment on Ash Street, or Davidson's apartment on Howe Street, or Crystal's on Horton Street, then "he had to be back with his former girlfriend" "Jen" on Walnut Street. According to Webster, Young had stayed with "Jen" "on and off, again a couple nights here and there" when he was not with Davidson. Not knowing the address, Webster provided the officers with a description of the building.

Although the officers had no way of knowing that Young was not, in fact, with Davidson as they had failed to locate either of them, the officers then traveled to the Walnut Street apartment building Webster had described. The six officers arrived at approximately 11:00 p.m. Spotting a familiar car parked outside the apartment building, officer Rawstron realized that "Jen" was Jennifer Coleman (Coleman). Officer Rawstron knew Coleman from a prior investigation, and knew that she had previously lived with Young in an apartment on Tampa Street. Based on that prior investigation, officer Michaud also knew that Coleman and Young had an "off-again, on-again" relationship.

Upon their arrival, officers Michaud and Brown positioned themselves at the front of Coleman's apartment building by a fire escape, while officers Rooney and Madore guarded the back of the building. Meanwhile officers Rawstron and Pappas, both armed and wearing bulletproof vests emblazoned with the word "police," entered Coleman's apartment building through a back door and climbed the three flights of stairs to Coleman's apartment. The landing in front of Coleman's door was too narrow for both officers Rawstron and Pappas to stand on with their equipment. So, they quickly positioned themselves with Rawstron in the front at Coleman's door and Pappas behind him, three or four steps down, with his head level with the doorknob. Once in position, officer Rawstron knocked on Coleman's apartment door. He heard someone from inside the apartment ask who was at the door, but did not respond as was his usual practice.

Less than a minute later, Coleman's 22-year-old daughter opened the door. Officer Rawstron asked her where her mother was and began to ask about Young when he noticed Coleman — who had been lying in bed in her room at the opposite end of the hallway — walking down the hallway to the front door. Coleman reached the officers within seconds but, by that time, officer Rawstron had, without consent, stepped into the apartment, and Pappas had moved

to stand in the doorway so that he could scan the hallway.[2]  Once inside her apartment, officer Rawstron asked Coleman if Young was there.  Coleman told officer Rawstron that her kids and Young were present.  Officer Rawstron then told Coleman that he needed to speak to Young and, again without asking for consent, he immediately walked by her and down the hallway.  Trooper Pappas

---

[2] This version of events regarding the officer's entry into Coleman's apartment was vigorously contested by Young's witnesses at the suppression hearing.  Coleman's daughter testified, for instance, that when she opened the apartment door an officer pointed a gun in her face and then immediately walked past her without her permission.  Similarly, Coleman testified that the officers were already coming down the hallway by the time she started for the door, and that the exchange between them took place halfway down the hallway by the dining room.  Moreover, exhibits presented by Young and testimony elicited during the suppression hearing suggest that the officers would not have been able to see Coleman approaching down the hallway from the bedroom without entering the apartment.  For example, trooper Pappas testified that "as soon as you reach [the] door that led into the apartment, there was nothing beyond it.  You either went to the right or to the left so basically what I was looking at was the wall."  Pappas added that he could only "begin to scan the interior portion of the hallway" when he was "on the threshold of the door" but not before.  And, in fact, the government conceded that after talking to officer Rawstron the prosecutor envisioned that "the hallway [went] directly down from the door" and that when they saw pictures of the entry they were "taken aback" because it was clear that "you can't see the hallway from the threshold" and "you do have to enter the apartment" to see down the hallway.  Regardless, the district court supportably found that officer Rawstron had already entered the apartment without consent as Coleman approached the door and that he was already at least some distance inside her apartment when he began to question her about Young's whereabouts.  Because officer Rawstron's unconsented-to entry is determinative, we need not address in detail the discrepancies between the various versions of events.

followed.  Both officers drew their weapons.  Officer Rawstron also carried a flashlight.

As officers Rawstron and Pappas reached Coleman's bedroom, officer Michaud, who was still guarding the front of Coleman's apartment building, observed one of Coleman's front blinds lift up, Young look out the window, and then the blinds close.[3]  A few seconds after the blinds went down, Michaud saw flashlights "scan across the window."

Back inside the apartment, officer Rawstron had reached Coleman's bedroom door, pushed aside a curtain that was covering the doorway, and discovered Young kneeling on the bed.  Seeing Young on the bed, officer Rawstron immediately pointed his firearm and flashlight at Young and ordered him to show his hands.  Officer Pappas, who was positioned behind officer Rawstron, also pointed his firearm at Young.  Young complied.  Officer Rawstron holstered

---

[3] The district court found that "about the same time" that officers Rawstron and Pappas entered Coleman's apartment building, trooper Michaud "observed one of the front window blinds being lifted, saw [Young] look out, and then saw the blinds close."  But a review of the record seems to offer a slightly more precise timeline.  Trooper Michaud testified at the suppression hearing that it was "a few seconds after the blind went down, [that he] saw some flashlights kind of scan across the window," and officer Rawstron testified that as he approached Coleman's bedroom he had a flashlight in one hand.  Officer Rawstron also testified that because Young was on the bed in a kneeling position with his hands under the blankets when he entered the room, he "waved his firearm and flashlight at him and ordered him to show his hands." Accordingly, it seems that trooper Michaud must have seen Young just before officers Rawstron and Pappas reached Coleman's bedroom door.

his weapon, grabbed Young's right arm, and ordered Young to move away from the bed. Young followed officer Rawstron's orders, and then trooper Pappas also holstered his firearm.

Having secured Young, officers Rawstron and Pappas began to question him. Over the course of the next hour the officers interviewed Young, who ultimately revealed the location of two large bundles of what appeared to be crack cocaine, which were inside a dresser drawer, and a firearm, which had been hidden under the mattress. The officers did not have a warrant, or, at that time, Coleman's consent to search Coleman's residence. During the interrogation of Young, officer Michaud "kept watch over" Coleman and her family in the apartment's kitchen and living area.

The district court found that "[f]rom the time police entered the Coleman apartment, they were in control of it." In the hour they spent in Coleman's apartment, neither Rawstron nor Pappas raised their voices, touched Young, or handcuffed him. They also did not advise Young of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). After seizing the drugs and the firearm, officer Rawstron informed Young that he was under arrest, placed him in handcuffs for the first time that evening, and escorted him out to trooper Rooney's car. Before escorting Young from the apartment, the officers asked for Coleman's consent to a dog search, and after removing Young from the apartment, they

finally asked her permission to search the apartment. Coleman consented to both searches.

Young subsequently moved to suppress the evidence seized at the time of his arrest, arguing that the officers had illegally entered Coleman's apartment without consent because they lacked a reasonable belief that Young lived there and that he was present. Young also sought to suppress all statements made on March 11, 2014, and the fruits thereof, on the grounds that those statements were made in violation of Miranda. The government conceded that all but one of Young's statements were obtained in violation of Miranda. Accordingly, the district court granted Young's motion to suppress his statements, except as to an initial "spontaneous" statement, which preceded any interrogation and was, therefore, admissible.[4] However, the district court denied Young's motion to suppress the evidence seized.

Applying Payton v. New York, 445 U.S. 573 (1980), and its progeny, the district court concluded that "at the time of their entry, the officers harbored a reasonable belief that the defendant resided there."[5] Specifically, the district court

---

[4] Upon entering Coleman's bedroom, officers Rawstron and Pappas informed Young that they had a warrant for his arrest for a drug conspiracy. Young responded, "Fuck, that means somebody's talking about me." The district court concluded that this "statement was not the product of coercive police activity but, rather, a spontaneous, voluntary utterance."

[5] As a threshold matter, the district court concluded that if officers reasonably believe an arrestee subject to a warrant

- 10 -

pointed to (1) Webster's statement that "if [Young] was not at the Ash Street, Howe Street, or Horton Street apartments, he had to be back with his former girlfriend" where he had stayed on and off when he was not with Davidson; (2) Webster's relative reliability since a "face-to-face informant" should generally be thought of as "more reliable than an anonymous telephone tipster," quoting United States v. Gay, 240 F.3d 1222, 1227 (10th Cir. 2001); (3) the fact that officer Rawstron recognized Coleman's car parked outside her apartment and that officers Rawstron and Michaud knew that Coleman had previously been in a relationship with Young and that they had lived together; (4) the fact that the officers had "eliminated three other addresses as places where the defendant might be found; and (5) "to cinch matters," the fact that Coleman confirmed that Young was present. The district court added that officer Michaud seeing Young open the blinds while he stood guard outside Coleman's apartment "strengthen[ed] the case" that the officers had a reasonable belief that Young resided at Coleman's apartment, but noted that this fact was "not necessary" to the district court's conclusion.

In addition, the district court determined that "[t]he time of day that officers knocked on the door . . . 11:00 p.m.,

resides at the targeted residence, then Payton v. New York, 445 U.S. 573 (1980) applies -- not Steagald v. United States, 451 U.S. 204 (1981).

- 11 -

when people typically are home — coupled with Coleman's confirmation of the defendant's presence, sufficed to confer a reasonable belief that [Young] was there."  The district court further concluded that the drugs and firearm seized "need not be excluded simply because [they were] discovered as a result of unwarned questioning in violation of Miranda," quoting United States v. Jackson, 544 F.3d 351, 361 (1st Cir. 2008), and that the government had met its burden to demonstrate that the search of Coleman's bedroom and the seizure of the drugs and gun were valid pursuant to Young's voluntary (if un-Mirandized) statements and that Young "impliedly consented" to the seizures.

As a result, Young conditionally pleaded guilty to conspiracy to distribute at least 28 grams of cocaine base and possession of a firearm in furtherance of a drug-trafficking crime, reserving his right to appeal the district court's adverse suppression rulings.  The district court then sentenced Young to 108 months' imprisonment on the conspiracy count and a mandatory consecutive 60 months' imprisonment on the firearm count.  This appeal followed.

**II.**

Here, Young challenges the officers' initial entry into Coleman's apartment.  He argues that the officers violated his Fourth Amendment rights because they lacked a reasonable belief that he resided at Coleman's apartment and was present when they

entered the residence.  Alternatively, Young argues that the search was conducted without voluntary consent, and that no other exception to the warrant requirement applies.

In reviewing the district court's denial of a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo.  United States v. Graham, 553 F.3d 6, 12 (1st Cir. 2009).  Young bears the burden to show a Fourth Amendment violation.  Werra, 638 F.3d at 330.

We begin with Young's challenge to the officers' initial entry into Coleman's apartment, "understanding that if we find this entry unjustified the evidence discovered subsequent to it must be suppressed."  Graham, 553 F.3d at 12.  "The Fourth Amendment provides protection against 'unreasonable searches and seizures,'" and "because 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[,] . . . [i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (alterations and omission in original) (quoting Payton, 445 U.S. at 585-86).  In Payton, "the Supreme Court held that police officers attempting to execute an arrest warrant have 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'"  Werra,

- 13 -

638 F.3d at 336-37 (quoting Payton, 445 U.S. at 603).[6]  Ensuing

case law makes clear that "[e]ven if it becomes known after entry

that the residence is not the suspect's, the entry is justified if

the police had 'reasonably believed' that (1) the suspect resided

at the location and (2) the suspect would be present."[7]  United

States v. Hamilton, 819 F.3d 503, 506 (1st Cir. 2016) (footnote

omitted) (quoting Graham, 553 F.3d at 12).  "Conversely, absent

exigency or consent, an officer may not search a third-party's

residence on the basis of an arrest warrant without having a search

warrant for the premises."  Solis-Alarcon v. United States, 662

F.3d 577, 580 (1st Cir. 2011).

_____

[6] The parties do not appear to challenge the application of
Payton to this case.  And the government assumes for the purpose
of this appeal that Young established a reasonable expectation of
privacy in Coleman's apartment sufficient to justify Fourth
Amendment protection.  However, the parties do dispute the
requisite level of belief that is necessary as to the residency
and presence requirements under Payton.  Specifically, they
dispute whether law enforcement must demonstrate that they had
"probable cause" or a "reasonable belief" to believe that Young
lived at Coleman's apartment and was present on the evening of
March 11.  As we have noted previously, "[a]lthough most circuits
to have considered the issue have adopted the 'reasonable belief'
standard, and treat it as less stringent than probable cause," we
have never explicitly decided the issue.  United States v. Werra,
638 F.3d 326, 337 (1st Cir. 2011) (collecting cases) (noting only
that we "have implicitly accepted the majority view").  Here, we
need not settle the matter because we conclude that the government
cannot meet even the less stringent "reasonable belief" standard.

[7] As the concurrence points out, the government conceded that,
under Payton, a two-part inquiry applied to this case.  Therefore,
we do not consider whether the alternative approach adopted by the
Second Circuit in United States v. Bohannon, No. 14-4679-cr, 2016
WL 3067993 (2d Cir. May 31, 2016) is correct.

Young asserts that neither the residency nor the presence inquiry was satisfied, arguing that there was insufficient evidence that officers reasonably believed that he lived at Coleman's apartment or was present, and that the district court erred by considering "information gathered only after the officers crossed the threshold" of Coleman's apartment to find that the officers had the requisite level of belief necessary to support their entry. In particular, Young challenges the district court's reliance on Coleman's post-entry confirmation that Young was present as a basis for concluding that the officers possessed a reasonable belief before they entered the apartment that Young resided there and was present. Young likewise challenges the district court's conclusion that officer Michaud's testimony — that he saw Young at the window of Coleman's apartment — "strengthen[ed] the case" that the officers had the requisite level of belief prior to their entry, arguing that the record evidence establishes that officers Rawstron and Pappas were already inside Coleman's apartment when Michaud observed Young at the window.

As an initial matter, we agree with Young that, to the extent that the district court relied on post-entry information to "cinch" or "strengthen" its finding that the officers reasonably believed that Young resided at and was present at Coleman's apartment, the district court erred. See Payton, 445 U.S. at 590 (noting that "the Fourth Amendment has drawn a firm line at the

- 15 -

entrance to the house"); Graham, 553 F.3d at 14 ("What the police discovered after they entered the apartment cannot help us determine what the officers could have reasonably believed before entering the apartment."). And, in fact, the government does not seem to disagree, conceding that "the officers crossed the 'firm line' at the threshold" before being told by Coleman that Young was inside. Rather, the government argues that "the preexisting information" had "already reasonably led the officers to believe Young was staying there and present at the time."[8]

To determine whether the officers possessed a reasonable belief that Young resided at Coleman's apartment then, we consider that preexisting information. Discarding all post-entry information, we are left with the following relevant information: (1) Webster's statement that "if [Young] was not at the Ash Street,

---

[8] Although the government seems to acknowledge that information gathered post-entry cannot support the entry itself, they nevertheless seek to rely on trooper Michaud's sighting of Young at Coleman's bedroom window to satisfy the presence inquiry of Payton — that officers reasonably believed Young was present. But as discussed in detail above, the record reveals that officers Rawstron and Pappas were already inside the apartment and, in fact, only steps away from Coleman's bedroom door when Young looked out the window. As such, this sighting cannot support a finding that the officers possessed the requisite level of belief before their entry into the apartment. And, although the concurrence suggests that officer Michaud's observation of Young at Coleman's window may have somehow justified a subsequent entry into the apartment (even though officer Michaud was part of the search team that violated Young's Fourth Amendment rights), the concurrence cites no cases supporting such a proposition in a case like this one, and we have found none.

Howe Street, or Horton Street apartments, he had to be back with his former girlfriend" where he had stayed on and off when he was not with Davidson; (2) the fact that Webster was not an anonymous tipster; (3) the fact that officer Rawstron recognized Coleman's car parked outside her apartment and that officers Rawstron and Michaud knew from a prior investigation that Coleman and Young had previously lived together; and (4) the fact that the officers had "eliminated three other addresses as places where the defendant might be found."

Mindful that we must "examine the information known to the officers in the totality and not in isolation," Graham, 553 F.3d at 14, we are nevertheless skeptical that these facts and circumstances are sufficient to support the residence inquiry — that the officers reasonably believed that Young resided with Coleman at the Walnut Street apartment before they entered her apartment. Although this case has none of the "rock-solid indicators of residence" present in other cases, see, e.g., Graham, 553 F.3d at 13 (explaining that "certain facts" such as a suspect's "credit card applications, utility bill, car registration, and mail" being directed to a house "will almost always give rise to a reasonable belief that the subject of an arrest warrant resides at the place entered"), we recognize that such "rock-solid indicators" are not necessarily required. Still, the evidence here is sparse even when compared to other cases where we have

- 17 -

found the residency and presence requirements satisfied.  See, e.g., id. at 13 (finding police had reasonable belief defendant resided at the apartment because a police report identified defendant and his address, a probationer reported defendant was "staying at" the apartment, and a person outside of the apartment confirmed defendant was inside); United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008) (finding police's belief objectively reasonable because hotel manager confirmed defendant rented Room 318 for a three-week period, and a man in the parking lot confirmed defendant was inside Room 318); United States v. Pelletier, 469 F.3d 194, 197, 200-01 (1st Cir. 2006) (finding reasonable belief when defendant's girlfriend's sister confirmed defendant was at a specific motel room, the motel room was registered in her name, and the maintenance man confirmed defendant was in the specific room).

To justify the officers' entry, the government relies heavily on Webster's reliability and on her statement that "if [Young] was not at the Ash Street, Howe Street, or Horton Street apartments, he had to be back with his former girlfriend."  But this statement was not sufficiently definitive or reliable to support a reasonable suspicion that Young was living with Coleman. To be sure, in some circumstances a statement by a reliable informant that a suspect is "staying" with or "living" with a particular person might support a reasonable suspicion that the

suspect lives there, see, e.g., United States v. Risse, 83 F.3d 212, 216–17 (8th Cir. 1996) (noting that "use of the colloquial term 'staying with'" can be interpreted to mean "living with"), but Webster did not inform officers decisively that Young was "staying" with Coleman. She said only that if Young was not staying at Ash Street, Howe Street, or Horton Street, then he had to be back with Coleman, but she did not actually confirm that Young was not, in fact, staying at those other apartments. Far from definitive, Webster's statement was closer to a guess than to a reliable tip. And Webster couched the statement even further, qualifying that Young had — at some point — stayed with "Jen" "on and off, again a couple nights here and there" when he was not with Davidson. Importantly, neither the officers nor Webster actually knew that Young was not with Davidson since the officers had failed to locate either of them. For all the officers knew, Young was, indeed, staying with Davidson and they were simply not at home.

Moreover, Webster's statement did not appear to be based on any actual, present knowledge of Young's whereabouts. She did not suggest that she had actually seen Young at Coleman's apartment. Nor did she state conclusively that she knew that Coleman and Young were back together. She merely stated that Young had previously stayed with Coleman and must be back there if the officers could not find him anywhere else, but she never explained

- 19 -

why this must be so or gave the basis for this knowledge. And the officers took no steps (e.g., conducting surveillance or other interviews) to verify that Young's prior relationship with Coleman had continued. The fact that officers Rawstron and Michaud also knew from a prior investigation that Coleman and Young had previously lived together does nothing to get them over this hurdle because their information was similarly dated. And, prior to speaking to Webster, it does not seem that the officers had reason to believe that Young and Coleman's relationship was ongoing since her apartment was not among those they had thought to visit.

In response to Young's argument that the officers' behavior on the evening of March 11 amounted to impermissible canvasing, the government notes correctly that suspects may have more than one residence for purposes of the Payton inquiry. But the officers did not begin their night knowing that Young would be at one of several apartments where he was known to reside and simply proceed to check each one. To the contrary, the officers thought that Young was with Davidson because of Davidson's statement to officer Rawstron "shortly before" that night that they were dating, and, prior to Webster's statement, the officers seemed to have no inkling that Young was living at Coleman's apartment. Nor did they seem to believe, prior to speaking to Webster, that Coleman's apartment was one of several places that Young currently lived.

Even assuming that the officers had a reasonable belief that Young resided at Coleman's apartment, however, there is nothing in this record to support Payton's presence requirement — that the officers reasonably believed that Young was present when they entered Coleman's apartment. The district court relied on only one pre-entry piece of information to justify the officer's entry, that being "[t]he time of day that officers knocked on the door." Officers arrived at Coleman's apartment at approximately 11:00 p.m., but the time of day, standing alone, is insufficient to support the conclusion that the officers had a reasonable basis to believe that Young was present at Coleman's apartment. See Werra, 638 F.3d at 339. As we have previously noted, "in cases where time of day has provided a basis for believing a suspect would be at home, the location of the suspect's residence was well established — making it more likely that he or she would be there." Id. at 340 n.19. Here, the officers knew only that Young had previously stayed with Coleman, and that he might be with her if he was not with Davidson at either the Howe Street or Ash Street apartments, and because he was not with Crystal at the Horton Street apartment.

The time of day and the fact that officer Rawstron recognized Coleman's car in front of her apartment would likely have been sufficient to support a reasonable belief that Coleman was present at the apartment at 11:00 p.m., but those facts do

- 21 -

nothing to support the officers belief that Young was there. And, as noted above, the officers did nothing to confirm Young's presence before entering the apartment "by, for example, conducting surveillance or placing a telephone call to the house." Id. at 338. Moreover, there is no evidence in the record to even suggest that Young was typically at home at 11:00 p.m., wherever he resided. See id. at 340.

Viewing the information known to the officers in totality, we therefore conclude that the information that was available to them before they entered Coleman's apartment was insufficient to support a reasonable belief that Young resided there and was present. Accordingly, the officers' entry into Coleman's apartment violated Young's Fourth Amendment rights. Having reached this conclusion, we need go no further as any evidence discovered subsequent to this unlawful entry must be suppressed. See Graham, 553 F.3d at 12. We therefore vacate Young's conviction, reverse the district court's denial of his motion to suppress, and remand for further proceedings consistent with this opinion.

**—Concurring Opinion Follows—**

**LYNCH**, **Circuit Judge**, **concurring.** Lamar Young was convicted, pursuant to his conditional guilty plea, of drug and weapons charges. That conviction has now been set aside. The police had a warrant for Young's arrest, and in my view -- in accord with the factfinding in the district court -- the officers acted reasonably in locating and arresting him. The positions the prosecution chose to take, and chose not to take, on two different issues lead me to this concurrence.

I agree with the majority that there was insufficient evidence to support a reasonable belief[9] that Young resided at Jennifer Coleman's apartment. Our analysis takes the form of a two-part Payton inquiry because the government chose that legal theory. See United States v. Hamilton, 819 F.3d 503, 506 (1st Cir. 2016) (articulating the two inquiries). But I am not inclined to think either that this case is about "residence" or that a two-part Payton inquiry ought to apply. Because the Walnut Street property was Coleman's residence -- not Young's -- I consider Young's Fourth Amendment interests to be far weaker than they would have been at Young's own residence. See Minnesota v. Carter, 525 U.S. 83, 88 (1998) ("[T]he extent to which the Fourth Amendment

_____

[9] I also agree that, even assuming the Payton "reasonable belief" standard is something less than probable cause, the government did not prove even that. See supra at 14 n.6; United States v. Hamilton, 819 F.3d 503, 506 n.5 (1st Cir. 2016) ("We assume without deciding that reasonable belief is a lesser standard than probable cause . . . .").

- 23 -

protects people may depend upon where those people are."); United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) ("To prevail on a [Fourth Amendment] claim . . . a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched.").

Rather, I consider this case to be about whether the police had a reasonable belief that Young, for whom there was an outstanding arrest warrant, would be located at the premises on Walnut Street.  In answering that question, I would employ the standard adopted by our sister court in United States v. Bohannon, No. 14-4679-cr, 2016 WL 3067993 (2d Cir. May 31, 2016).  See id. at *6 ("[I]f, at the time of entry, law enforcement officers possessed a valid warrant for the subject's arrest and reason to believe that he was then in the premises entered, the subject of the arrest warrant will not be heard to complain that entry was not authorized by a search warrant."); id. at *13 ("The third-party resident's Fourth Amendment right in such circumstances to have the entry into his home authorized by a search warrant does not extend to the subject of the arrest warrant." (citation omitted)).  And I would answer that question in the affirmative. Each step of the investigation made the officers' belief as to Young's location more and more reasonable.  In this regard, I disagree with my colleagues.

- 24 -

I concur, nevertheless, because the prosecution failed to satisfy Payton's residence inquiry. The prosecution agreed with the defense's position that Payton's two-part inquiry applied and so represented to the district court -- both to the magistrate judge and to the district judge. And, in my view, the prosecution should be bound by the theory it adopted. I do not fault either that court or ours for adhering to the path agreed upon by both the government and the defendant.

The prosecution also made a second choice that leads me to concur. The inevitable discovery doctrine "allows for the admission of [otherwise excludable] evidence that would have been discovered even without the unconstitutional source." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (citing Nix v. Williams, 467 U.S. 431, 443-44 (1984)). The government's brief makes only a glancing reference to the doctrine of inevitable discovery -- and only in service of an argument that Coleman's consent to the search of her home would have led inevitably to discovery of the seized cocaine and firearm. The government notably did not argue that officer Michaud, standing outside Coleman's residence, saw Young inside at the window and so knew that Young was present in that apartment. Regardless of whether the officers at Coleman's apartment door otherwise had a reasonable basis to believe Young was located inside the apartment, officer Michaud's observation could have justified his own entry -- or the entry of a second

- 25 -

group of officers from outside the building -- and perhaps would have led inevitably to discovery of the disputed evidence. See United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006) (observing that the deterrence rationale for the exclusionary rule has minimal force "if the evidence would have been discovered lawfully" (citing Nix, 467 U.S. at 444)); United States v. Scott, 270 F.3d 30, 43 n.7 (1st Cir. 2001) ("[We have] rejected a strict requirement that the alternate legal avenue of investigation be actively pursued at the time of the illegal search or seizure.").

Having failed to take advantage of these justifications for its search of Coleman's residence, the government must now live with the consequences.