UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                    Criminal No. 16-cr-166-01-JD
                                          Opinion No. 2016 DNH 223
Joseph Davis


O R D E R


Joseph Davis is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Davis moves to suppress all evidence that was seized as the result of a search after Davis was arrested for driving under the influence of drugs or alcohol in the early morning of July 2, 2016. The government opposes the motion.

The court held a hearing on the motion to suppress on December 14 and 15, 2016. During the hearing, the defense presented testimony from Davis, Davis's wife, Tori Payne, and Aaron Lee Bruton, who had been with Davis prior to the arrest. The government presented testimony from Hampton police officers, Matthew Robinson, Justin Hood, and Christopher Zigler, who participated in the arrest, and from Jovan Townes, who had been with Davis prior to the arrest.

## Standard of Review

The defendant bears a threshold burden to show a Fourth Amendment violation to support a motion to suppress. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016); see also United States v. Battle, 637 F.3d 44, 48 (1st Cir.2011) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)). When, as here, a warrantless search of a vehicle is at issue, the defendant has the burden to show that he had a reasonable expectation of privacy in the vehicle. United States v. Almeida, 784 F.3d 41, 48 (1st Cir. 2014). If the defendant shows a Fourth Amendment violation, the government must show, by a preponderance of the evidence, that an exception to the warrant requirement applies. Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Matlock, 415 U.S. 164, 178 & n.14 (1974).

## Background

On the evening of July 1, 2016, Davis and his then fiancé, Tori Payne, travelled to Hampton, New Hampshire, for Davis to perform as a rap artist at the Cloud 9 Bar and Grille on Hampton Beach with another rap artist, Aaron Bruton.[1]  Davis and Payne drove in Payne's car, a 2013 Ford Focus, with Payne driving. Other people, including Aaron Bruton, Bruton's two cousins who

---

[1] Davis and Payne were married in September of 2016.

2

were visiting from New York, Davis's brother, and Jovan Townes, also went to the Cloud 9 bar but drove in separate cars.

Payne testified at some length that she did not allow anyone else, including Davis, to drive her car because it was in her name, it was new, and because her insurance covered only her. Davis testified, however, that he drove the car almost every day with her knowledge and according to their schedule for picking up Payne's daughter from school and to do errands. Payne also acknowledged that Davis had driven her car.

Payne parked the car on the street near the club. Payne and Davis got out of the car to talk with the other people who came with them. Payne serves as Davis's manager and promoter for his performances. Bruton parked near Payne's car. Payne and the whole group, including Davis, went into the club to prepare for the performance. Payne left the keys in her car so that the people in their group could get equipment out of the car for the show if it were needed.

Payne left her purse in the trunk of the car to avoid taking it into the bar. She said that she had many things in the trunk, in addition to her purse, including children's clothes, shoes, Davis's hats, jumper cables, and a gun that had been her grandfather's which she kept in a black Dirt Devil bag. Payne testified that she did not keep the gun in the interior of

3

the car because children rode in the car. She also testified that she never told Davis that the gun was in the trunk because it was none of his business.

Once Davis was checked in and ready to perform, Payne left the club to walk up the strip at Hampton Beach to promote Davis as a rap artist. She testified that Davis, his brother, and his friends had gotten on her nerves that night so that she did not want to be with them. She walked up the Hampton Beach strip interacting with people, taking pictures, and handing out CDs. Payne did not stay in the area of the Cloud 9 bar but instead traveled a distance up the strip.

After the performance, in the early morning of July 2, 2016, Davis, Bruton, and others left the club and went to get pizza. Davis needed to go to the bathroom, so he went back to the club but was not allowed inside. He got the keys to Payne's car from his brother in order to drive north on Ocean Boulevard to the public bath house on the beach to find a bathroom. Bruton and his cousins got into their car and left at the same time, following Davis.

Hampton police officers, Detective Matthew Robinson and Officer Justin Hood, were in a cruiser facing southbound on Ocean Boulevard not far from the Cloud 9 bar. Officer Christopher Zigler was in another cruiser also monitoring

4

traffic on Ocean Boulevard and was parked next to Robinson and Hood. The officers saw a car back out of a space near the Cloud 9 bar and proceed north on Ocean Boulevard without its lights on. The car drifted across the road, crossed the fog line, and stopped just off the travel lane close to pylons at end of the parking area. The car was not in a parking space but instead was parallel to the traveled part of Ocean Boulevard, blocking access to a handicap parking space. Robinson and Zigler came up behind the car and activated their blue lights.

Robinson went to the driver's side and Zigler went to the passenger side of the car. Hood stood behind Zigler on the passenger side. The officers had flashlights to look into the car. Davis was the only person in the car.

Robinson noticed that the car smelled of alcohol and marijuana and that there were blue transparent cups, known as party cups, stacked on the console with liquid in them. Robinson thought that Davis was driving under the influence. Robinson saw that Davis was wearing a very large blue bandana around his neck, which Robinson thought was odd in the heat of the summer.

Robinson told Davis that he was stopped because he did not have the car lights on and asked him what he had had to drink. Davis apologized for his driving and explained that he had just

performed at the Cloud 9 bar, that he was looking for a bathroom, and that he urgently needed to urinate. Davis then urinated in his pants. Robinson noticed that Davis appeared to be impaired.

While they were talking, Davis repeatedly put his hand down in the area of his right pocket or the center console. That was a safety concern for Robinson so he told Davis to keep his hands where Robinson could see them. Although Davis complied, his hand then drifted back down to his right side.

Robinson asked Davis for his license, which Davis produced. At the same time, the car lurched forward because Davis had not put the car into park. Robinson went back to his cruiser to check Davis's license on the computer, which took several minutes because Robinson also called dispatch to check the license.

While Robinson was back at his cruiser, Davis took off the blue bandana and put it over the party cups on the center console. Zigler also noticed that Davis repeatedly put his hand down near his right side. Zigler asked Hood to watch Davis and walked to the cruiser to talk to Robinson.

Zigler reported to Robinson that he was uneasy about the situation because Davis kept reaching down to his right side and because he had covered the cups with his bandana. Zigler

6

suspected that Davis was trying to conceal something, which was probably an open container of alcohol. Robinson said there was a strong odor of alcohol and marijuana in the car. While Robinson was trying to contact dispatch, Zigler went back to Davis's car to talk with him. Zigler also noticed a strong smell of alcohol and marijuana in the car.

Through the license check, Robinson learned that the car was not registered to Davis and that Davis's license was suspended. Robinson returned to Davis's car and asked Davis to step out of the car. He saw the blue bandana on the center console. Zigler was standing with Robinson when Davis opened his door, and Zigler saw a bottle of alcohol, labeled Hennessey, in Davis's door pocket.

When Bruton saw the police cruisers pull up behind Davis, Bruton pulled over and then drove back around, eventually parking about three spaces from where Davis and the police cruisers were located. Bruton got out of his car and walked over to Davis and the officers.

The officers noted that Davis had difficulty walking and that he leaned on the car for balance. Davis admitted that he had had a couple of drinks at the Cloud 9 bar. Davis agreed to do sobriety tests, and Robinson administered three tests. Davis

failed the tests, and Robinson arrested him for driving under the influence.[2]

Once Davis was in handcuffs, Robinson began to search him. Because Davis's pants were wet with urine and Hood was wearing gloves, Hood completed the search. Hood took car keys out of Davis's pocket. After the search, Davis was put in the cruiser.

A crowd had gathered around Davis's car and the cruisers. While Robinson did the field sobriety tests and placed Davis under arrest, Zigler was monitoring the crowd and asking them to move back to allow room for the tests. The officers testified that two men came forward out of the crowd and identified themselves as friends of Davis.[3] Davis also said that he knew the men. Robinson asked the men if they would take Davis's car so that it would not have to be towed but they refused. The officers did not get the men's names, and the men left.

Bruton testified that he was standing within handshake distance of Davis and the officer at the end of the sobriety testing and when the officer put Davis in handcuffs. Bruton

---

[2] For purposes of the motion to suppress, Davis agrees that he was lawfully detained and arrested.

[3] In the motion to suppress, the defense identified the two men as Aaron Bruton and Jovan Townes. Bruton testified that he did not recall that Townes was there. Townes testified that he was not there when Davis was arrested and that he did not want to get involved because he did not have a driver's license.

also testified that Davis and the officer with Davis asked him if he could take Davis's car.  He said that that the officer with Davis took the car keys out of his pocket and handed the keys to Bruton.  According to Bruton, he asked if he could leave the car where it was, and the officer answered that he could not do that because Davis was under arrest.

Bruton testified that he never refused to take Davis's car and that he continued to try to find someone to take the car.  Jovan Townes testified that Bruton called him when he was on the way home to Manchester with Davis's brother and wanted him to come back to get Davis's car.  Bruton called and texted Payne to let her know what was going on, and Payne told Bruton that she was trying to get a ride to get back.  Payne testified that she was far away when she started getting texts and calls and that she ignored them at first because she was irritated with Davis and his brother.  By the time Payne got back to where Davis and the car had been, they were gone.

In their testimony, Robinson and Zigler explained that police policy is to call a tow truck when someone is arrested for driving under the influence.  Sometimes, however, they will let another person take the car if there is someone who is authorized by the person under arrest, has a valid driver's license, and is not impaired.  The officers said that they

9

considered doing that in this instance because Davis had been polite and cooperative so they were inclined to save him the towing fee.  Furthermore, it would be quicker and simpler if someone who was sober and with a valid license could take the car.

Robinson and Hood drove Davis to the police station in the cruiser.  Zigler called a tow truck because no one was able to take the car, it was illegally parked, and it was a hazard on Ocean Boulevard at that hour.  Zigler stayed with Davis's car, waiting for the tow truck to arrive.  Bruton testified that he also stayed and that he had the keys to the car.

The Hampton Police Department has a "Motor Vehicle Inventory Search Policy."  Under the policy, a vehicle must be towed if it is illegally parked and is a hazard to traffic.  Officers are required to conduct a "lawful inventory search of a vehicle" if, among other circumstances, a "vehicle is being towed under orders of a department member" and the owner or custodian is under arrest or the driver is under arrest and the owner or custodian is not present.  Doc. 14-3.  The inventory search is made of all areas in the passenger compartment of the vehicle and the trunk and should be conducted at the scene before the vehicle is towed.

10

During the search, the officer is to complete an inventory form. The purpose of the search and inventory "is to protect the owner's property . . .; to protect the department member and department against false claims or disputes over lost, stolen, or damaged property; to protect the members from potential danger;" and to help determine if the vehicle is stolen or abandoned. Id. Zigler understood that the policy required him to record on the inventory form only the items of value that were left in the car.

The policy provides that "any items discovered in plain view, where the incriminating nature of the item/s are immediately apparent, shall be seized as evidence of the crime." Id. The policy also instructs, however, that "[i]f probable cause develops during an inventory search, the inventory search shall cease and the officer shall apply for a search warrant." Id. In addition, "[t]he inventory search shall not be undertaken merely as a subterfuge to facilitate a criminal investigation." Id.

Before the tow truck arrived, Zigler opened the car and took the bottle of Hennessey he had seen in the driver's door pocket and the party cups as evidence related to the arrest for driving under the influence. He also saw a small jar of what

11

appeared to be marijuana behind the cups and took that.[4] Zigler did not take a second jar with what appeared to be remnants of marijuana. The blue bandana was on the passenger seat. Bruton testified that he did not see Zigler go into the car.

Zigler got an inventory form and searched the in order to note anything of value that would be left in the car. In the trunk, Zigler found a purse and wallet, which belonged to the registered owner of the car, Payne. Zigler noted those items on the inventory and left them in the locked trunk. Nothing else of value was left in the car.

In preparation for towing, Zigler reached across the driver's seat to put the keys into the ignition. As he was doing that, Zigler saw a handgun located between the driver's seat and the center console. He thought it was not safe to leave the gun in the car because it was being towed and would be left in a parking lot. Zigler took the gun for safekeeping, both because of the safety risk and to protect an item of value.

The gun was loaded with a bullet in the chamber and the safety was off. Zigler unloaded the gun and locked it. To protect the gun, he wrapped it in Davis's blue bandana and took it with him in the cruiser. Zigler then drove to the police

---

[4] The government does not intend to introduce the marijuana as evidence in this case. For that reason, the jar of marijuana is not at issue for purposes of the motion to suppress.

station and turned over the Hennessey bottle, cups, and gun to Robinson.

## Discussion

Davis moves to suppress all of the evidence that Zigler took from Payne's car. In support, he contends that Zigler conducted a warrantless search of the car in violation of the Fourth Amendment. The government objects, arguing that Davis had no reasonable expectation of privacy in Payne's car, that the cups, Hennessey bottle, and bandana were lawfully seized under the plain view exception to the warrant requirement, and that the gun was lawfully seized under the community caretaking exception.

## A.  Reasonable Expectation of Privacy

It is the defendant's burden to make a threshold showing that he had "'a reasonable expectation of privacy in the area searched and in relation to the items seized.'" United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). "This burden must be carried at the time of the pretrial hearing and on the record compiled at the hearing." Id. (internal quotation marks omitted). When the place searched is a car, the defendant must show "a property interest or a possessory interest in the automobile." United States v. Symonevich, 688 F.3d 12, 19 (1st

13

Cir. 2012). When the defendant has borrowed someone else's car, with permission, the court considers the following factors to determine whether the defendant had a reasonable expectation of privacy in the car:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such.

Almeida, 784 F.3d at 47.

In this case, there is conflicting testimony about whether Davis borrowed Payne's car with her permission and the frequency of his use of the car. Although Payne testified that Davis was never allowed to drive her car, Davis testified that he drove the car with her knowledge and permission almost every day. On the night of the arrest, he had been a passenger in the car on the way to the Cloud 9 bar. Davis did not have the keys to the car, which he obtained from his brother. He drove the car for only seconds before the stop occurred.

Davis testified that he kept personal belongings in the car, and Payne testified that Davis's hats were in the trunk. Payne also testified that she did not lock the car when she parked and left the keys in it so that others could get the

14

equipment out as might be necessary.  When Davis was stopped and got out of the car, he left the driver's door open.

Based on those circumstances, it is far from clear that Davis had a reasonable expectation of privacy in the car.  It is not necessary, however, to resolve this close question because even if the Fourth Amendment protected the interior of the car, the items were seized lawfully.

## B.  Plain View

The government contends that the cups, bandana, and bottle of Hennessey were lawfully seized because they were in plain view.  Under the plain view exception to the warrant requirement, "a warrantless seizure is nevertheless lawful if (1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a lawful right of access to the object itself." United States v. Allen, 573 F.3d 42, 51 (1st Cir. 2009). "[P]robable cause exists when the incriminating character of an object is immediately apparent to the police." United States v. Sanchez, 612 F.3d 1, 5 (1st Cir. 2010).

In support, the government asserts that Zigler saw the cups and bandana through the windows of the car and saw the bottle of Hennessey in the car door when Davis opened the door.  Based on

Zigler's observations, the government argues that those items were properly seized under the plain view doctrine. The defense does not appear to challenge Zigler's seizure of the bottle of Hennessey under the plain view doctrine, but did press Zigler during the hearing about whether he could see liquid in the cups and whether he had probable cause to believe there was liquor in the cups. Zigler testified that he did not see any liquid in the cups and, therefore, did not have probable cause to seize the cups.

The court need not decide whether the plain view doctrine applies in these circumstances, because the cups, the Hennessey bottle, and the bandana would have been discovered and seized during the inventory search.

C. Inventory Search

The defense argues that the inventory search was illegal because there was no reason to tow the car, making the inventory unnecessary. The defense also contends that Zigler did not conduct a valid inventory search. The evidence does not support the defense's theory.

"Under the community caretaking exception to the Fourth Amendment warrant requirement, police may impound a vehicle for noninvestigatory purposes when it is reasonable to do so," such as when the driver has been arrested, no one is immediately

16

available to take possession of the car, and the car is not parked legally or may be an impediment to traffic. Jaynes v. Mitchell, 824 F.3d 187, 197 (1st Cir. 2016) (internal quotation marks omitted). "Once a car is impounded, an inventory search follows as a matter of course in prudent law enforcement practice." Id. "[I]nventories pursuant to standard police procedures are reasonable." South Dakota v. Opperman, 428 U.S. 364, 372 (1976); United States v. Jeffreys, 111 F. Supp. 3d 70, 78 (D. Mass. 2015).

The Hampton police policy is to tow a car when the driver is arrested for driving under the influence and the car is parked illegally or is a traffic hazard. There is no dispute that Davis was arrested. Robinson and Zigler testified that the car was parked illegally and was also a traffic hazard.

Robinson and Zigler also testified that sometimes, instead of towing and as a courtesy, they will allow another person to take a car if that person has a valid driver's license and is not impaired. They were willing to do that in this case because Davis had been polite and cooperative. The two men, who Davis knew and who came forward after he was arrested, refused to take the car when asked by an officer if they would do so. As a result, towing the car was the only option.

17

Bruton testified that he was willing to take Davis's car and that the officers gave him the keys to the car. Robinson said he would not have given Bruton the keys to the car without first ascertaining whether he had a valid driver's license and was sober. The court does not find Bruton's testimony credible.

Under the Hampton police policy, the car had to be inventoried before it was towed. Zigler testified about his inventory search which included the interior of the car and the trunk. He also completed an inventory form listing the purse and wallet he found in the trunk.

Bruton testified that he never saw Zigler go into Payne's car or open the trunk. Bruton's version of events, however, does not undermine Zigler's testimony that he conducted the inventory search because Bruton was not necessarily watching Zigler during the entire encounter. Bruton stated that he was busy on his phone trying to contact Payne and Townes and trying to find someone to take the car. The court credits Zigler's account of the inventory search and concludes that it was properly conducted and valid.

Even if the bottle, the cups, and the bandana were not properly seized as evidence in plain view, the inevitable discovery exception applies:

> The application of the inevitable discovery exception involves three questions: first, whether the legal

18

means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

United States v. Almeida, 748 F.3d 41, 49 (1st Cir. 2014) (internal quotation marks omitted).  The bottle of Hennessey was in the door pocket, the cups were on the center console, and the bandana was on the car seat.  Zigler would have found those items in the course of his inventory search and application of the exception here is appropriate.

D.  The Gun

Zigler did not find the gun during the initial inventory search.  Instead, he saw the gun tucked next to the driver's seat when leaned across the driver's seat to put the keys into the car ignition for the tow truck operator.  The gun was loaded, had a bullet in the chamber, and the safety was off.  Zigler took the gun both as valuable property that should not be left in the car and for safety reasons.[5]  The court finds that Zigler's testimony is credible about the circumstances of finding and taking the gun.

---

[5] The gun was not seized as evidence of a crime.  At the time of the impoundment, Davis was charged with driving under the influence, which did not involve the gun.  The gun itself did not appear to be evidence of a crime.

19

The impoundment of the car was reasonable and made an inventory search necessary and appropriate. Zigler legally had access to the car for the purpose of the impoundment, which included taking the inventory and putting the keys in the ignition before the car was towed. Zigler's explanation that it would not have been safe or prudent to leave a loaded gun in the car during the towing process and while the car was stored in a parking area is consonant with the community care taking exception. Therefore, seizure of the gun as part of the inventory process and for the additional purpose of community safety did not violate the Fourth Amendment.

## Conclusion

For the foregoing reasons, the defendant's motion to suppress (document no. 11) is denied.

SO ORDERED.

Joseph DiClerico, Jr.
United States District Judge


December 20, 2016

cc:  Bruce E. Kenna, Esq.
     Robert M. Kinsella, Esq.
     United States Marshal
     United States Probation

20